UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                   :
PRESIDENT OREN BARZILAY *as President of*                          :
*Uniformed EMTs, Paramedics, and Fire Inspectors,*                 :
*Local 2507, DC 37, AFSCME, et al.*,                               :
                                                                   :          20-cv-4452 (LJL)
                                           Plaintiffs,             :
                                                                   :          OPINION AND ORDER
                    -v-                                            :
                                                                   :
CITY OF NEW YORK, *et al.*,                                        :
                                                                   :
                                           Defendants.             :
                                                                   :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _7/8/2022____

LEWIS J. LIMAN, United States District Judge:

Defendants City of New York (the "City"); Daniel Nigro ("Nigro"), as Commissioner of

the Fire Department of the City of New York; and Carlos Velez ("Velez") (collectively,

"Defendants") move for summary judgment, pursuant to Federal Rule of Civil Procedure 56,

dismissing each of plaintiffs' claims. Dkt. No. 58. Plaintiffs Uniformed EMTs, Paramedics, and

Fire Inspectors, Local 2507, DC 37, AFSCME ("Local 2507" or the "Union"); Oren Barzilay, as

President of Local 2507 ("Barzilay"); Elizabeth Bonilla ("Bonilla"); Alexander Nunez

("Nunez"); Megan Pfeiffer ("Pfeiffer"); and John Rugen ("Rugen") (collectively, "Plaintiffs")

move for partial summary judgment on their claim that Defendants deprived Plaintiffs of their

liberty interests without due process. Dkt. No. 45.

Plaintiffs are Emergency Medical Technicians ("EMTs") and paramedics who work for

the Fire Department of the City of New York ("FDNY") and the union that represents them.

Defendants are the Commissioner and Assistant Commissioner of the FDNY, as well as the City

of New York. Plaintiffs have brought this action complaining that Defendants (1) infringed upon

Plaintiffs' freedom of expression by retaliating against them because they communicated with

the media on matters of public concern, in violation of the United States and New York Constitutions; and (2) deprived them of liberty and property interests without due process by restricting their employment and barring them from working as EMTs and paramedics in New York City's 911 system without providing notice or an opportunity to be heard, also in violation of the United States and New York Constitutions.

For the reasons that follow, Plaintiffs' motion for partial summary judgment is denied, and Defendants' motion for summary judgement is granted in part and denied in part.

## BACKGROUND

The following facts are taken from the parties' Rule 56.1 statements and are taken as undisputed for purposes of this motion except where otherwise stated.  The Court construes the facts in favor of the non-moving party.

## I.      The Parties and Other Relevant Persons

Plaintiff Local 2507 is a labor organization whose members include persons employed by the FDNY who work as EMTs and paramedics, including in the emergency medical 911 system in New York City.  Dkt. No. 72 ¶ 1.

Plaintiff Barzilay is currently employed by the FDNY as an EMT and has held that title since 1996.  Dkt. No. 48 ¶ 1.  Since 2000, he has also been a representative of Local 2507, which represents EMTs, paramedics, and fire inspectors.  *Id.* ¶¶ 2–3.  In 2017, Barzilay became President of Local 2507, and while he is serving as Union President, he is now on full-time release from his position as an EMT for the FDNY.  *Id.* ¶ 10.

The other plaintiffs are all either EMTs or paramedics with the FDNY.  Rugen has been an EMT since 2004 and is also an Executive Board Member of Local 2507, a position he has held since 2011.  *Id.* ¶¶ 11–12.  Pfeiffer began working for the FDNY in 2012 as an EMT and in 2013 was promoted to paramedic.  *Id.* ¶¶ 22–23.  Nunez began working for the FDNY in 2013 as

a paramedic.  *Id.* ¶ 28.  Elizabeth Bonilla began working for the FDNY in July 2014 as an EMT and was promoted to paramedic in 2018.  *Id.* ¶¶ 32–33.  Pfeiffer, Nunez, and Bonilla all are members of Local 2507.  *Id.* ¶¶ 25, 29, 35.

Defendant Nigro is the Commissioner of the FDNY.  *See* Dkt. No. 72 ¶ 110.  The Office of Health Care Compliance ("OHCC") is a division of FDNY's Legal Affairs.  Dkt. No. 48 ¶ 38. Terryl Brown ("Brown") is the FDNY's Chief Legal Counsel and Deputy Commissioner for Legal Affairs and Administration, and James Saunders ("Saunders") is FDNY's Deputy General Counsel, Chief Health Care Compliance and HIPAA Privacy Officer, reporting directly to Brown.  *Id.* ¶¶ 39–41.  Saunders is tasked with ensuring that the FDNY compliance with the New York State Medicaid regulations remains effective; ensuring that FDNY has processes and procedures in place for handling protected health information and the disclosure thereof; and monitoring violations of federal regulations with respect to FDNY's handling of protected health information.  *Id.* ¶ 43.

The Bureau of Investigations and Trials ("BITS") is also a division of FDNY's Legal Affairs.  *Id.* ¶ 45.  It is the disciplinary unit of the FDNY and handles investigations into and the discipline of employee misconduct and/or violations of FDNY policies and procedures or prevailing laws.  *Id.* ¶ 48.  Defendant Velez is Assistant Commissioner of the FDNY and has overseen and managed BITS since June 25, 2018.  *Id.* ¶ 46.  He reports directly to Brown.  *Id.* ¶ 47.

The New York City Department of Investigation ("DOI") is a New York City agency that has jurisdiction over certain matters, such as criminal violations by city agency employees.  Dkt. No. 71 ¶ 71.  It receives matters from BITS for investigation.  It is an entity separate from FDNY that works independently from FDNY.  Dkt. No. 72 ¶ 85.  BITS will not itself investigate a

matter until DOI has informed BITS that DOI will not be pursuing an investigation.  Dkt. No. 48 ¶¶ 82, 87.

## II.     The Collective Bargaining Agreement

The terms and conditions of employment of FDNY EMTs and paramedics, including the individual Plaintiffs, are governed by a collective bargaining agreement ("CBA") between their representative, District Council 37, AFSCHME, AFL-CIO, together with its affiliates Locals 2507 and 3621, and the City of New York.  Dkt. No. 72 ¶ 141.  The CBA consists of three documents: (1) a contract covering the period July 1, 2002 through June 30, 2006; (2) a Memorandum of Agreement extending the 2002–2006 contract, with modifications, for the period July 1, 2006 through September 5, 2010; and (3) a Memorandum of Agreement further extending the contract, with modifications, covering the period September 6, 2010 through September 6, 2018.  *Id.*  Although the terms of the CBA expired in 2018, the parties continue to treat the contract as binding pending negotiation of successive terms.  *Id.*

The CBA specifies salaries and salary ranges for employees of differing titles.  Dkt. No. 59-15 Art. III § 2.  The CBA defines overtime, night shift differential, and meal and holiday pay to be benefits applicable to Emergency Medical Services ("EMS").  Dkt. No. 71 ¶ 109; *see also* Dkt. No. 59-15 Art. V § 2 (containing overtime and meal-pay provisions of the CBA and stating that those who "perform[] overtime work" shall be reimbursed at overtime rates).

The CBA also contains grievance procedures; the parties dispute whether restrictions of duties are events that are subject to the CBA's grievance procedure.  Dkt. No. 71 ¶ 93.  The CBA defines "grievance" as:

a. A dispute concerning the application or interpretation of the terms of [the CBA];

4

b. A claimed violation, misinterpretation or misapplication of the rules or regulations, ***written*** policy or orders of the Employer applicable to the agency which employs the grievant affecting terms and conditions of employment . . .;

c. A claimed assignment of Employees to duties substantially different from those stated in their job specifications;

. . .

e. A claimed wrongful disciplinary action taken against a permanent Employee covered by Section 75(1) of the Civil Service Law or a permanent Employee covered by the Rules and Regulations of the Health and Hospitals Corporation upon whom the agency head has served written charges of incompetence or misconduct while the Employee is serving in the Employee's permanent title or which affects the Employee's permanent status.

. . .

g. A claimed wrongful disciplinary action taken against a provisional Employee who has served for two years in the same or similar title or related occupational group in the same agency. . . .

Dkt. No. 59-15 Art. VII, § 1. A union grievance, if not resolved, can lead to an arbitration or an improper-practice hearing, during which the Union and management can present witnesses and evidence to support their respective positions, question the witnesses for the other side, and be represented by counsel. Dkt. No. 71 ¶ 94. In the case of an arbitration, the decision of the arbitrator is final. *Id.* ¶ 96.

A 2018 dispute concerning whether restrictions imposed on FDNY EMTs and paramedics were disciplinary actions that could be contested under the CBA's grievance and arbitration procedure was decided in January 2021 by arbitration. Dkt. No. 72 ¶ 142. In his Opinion and Award, the arbitrator explained that "[t]he Fire Department has the managerial right to assign and transfer its employees and the Union has the contractual right to grieve disciplinary actions taken against its members." Dkt. No. 69-41 at 23. The arbitrator further suggested that restrictions may be challenged under the CBA only if there is "evidence of punitive intent sufficient to establish that the Grievants' restricted duty assignments were, at any point,

disciplinary in nature," *id.* at 28, and denied four of the grievances where the arbitrator could not conclude the restriction ever became disciplinary in nature, *id.* at 28–31, 33; *see also id.* at 15 (noting the Union's position that the FDNY's managerial rights to assign its employees "is arbitrable, and thus subject to review, when it is disciplinary in nature").

## III.    Rules Regarding Patient Confidentiality

New York Public Health Law restricts disclosure of Protected Health Information ("PHI") to third parties without the consent of the patient or the patient's legal representative. Dkt. No. 71 ¶ 36.  PHI includes (1) an individual's past, present, or future physical or mental health condition; (2) the provision of health care to the individual; (3) the past, present, or future payment for the provision of health care to the individual; or (4) any identifiable health information that identifies the individual or for which there is a reasonable basis to believe it can be used to identify the individual.  *Id.* ¶ 41.  Examples of patient identifiers includes addresses, account numbers, medical record numbers, license plates, incident dates, images, and health plan numbers.  *Id.* ¶ 42.

The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") is the principal federal law addressed to the protection and permissible sharing of patient health information.  It establishes uniform national standards for identifying patient and coding diagnoses both to facilitate and to regulate the sharing of patient health information.  *Id.* ¶ 37. Under a regulation issued in 2002 by the Department of Health and Human Services (the "HIPAA Privacy Rule"), most individually identifiable health information held or transmitted by a covered entity in any form or media (whether electronic, paper, or oral) is protected.  *Id.* ¶¶ 37, 40; 45 C.F.R. pts. 160, 164.  The HIPAA Privacy Rule requires covered entities to implement reasonable safeguards to limit incidental uses or disclosures of protected health information.  45 C.F.R. § 164.530.  The FDNY as a whole is considered a "hybrid entity" because its business

activities include both HIPAA and non-HIPAA functions.  Dkt. No. 71 ¶ 38.  As a unit within the FDNY that creates, obtains, maintains, or has access to PHI, EMS is considered to be a covered component subject to privacy regulation both by the state and by the federal government under HIPAA.  *Id.* ¶¶ 38–39.  A violation which compromises the security or privacy of the PHI and that leads to significant risk of financial, reputational, or other harm to the individual constitutes a breach of HIPAA.  *Id.* ¶ 51.

Within the FDNY, the OHCC responds to reports of suspected violations of HIPAA, which may result from a myriad of sources.  *Id.* ¶ 46.  HIPAA breaches can result in criminal and civil penalties for covered entities.  *Id.* ¶¶ 54–56.  The parties dispute whether all FDNY personnel are advised that HIPAA breaches can lead to civil and criminal penalties, *id.* ¶ 57, but they agree that Rugen, Nunez, Bonilla, Pfeiffer, and Barzilay were aware of their obligations to protect patient confidentiality, *id.* ¶ 59.

FDNY maintains policies governing the release of confidential information, such as patient medical information, *id.* ¶ 1, but the parties dispute what policy was in effect at the time of the events in this case, *id.* ¶ 2.

## IV.    The Local 2507 Publicity Campaign

Commencing in 2019, Local 2507 launched a publicity campaign to address the wage disparity of its members and the difficulties faced by Union members in their performance of EMS services in and around New York City.  *Id.* ¶ 31.  With the onset of the COVID-19 pandemic in March 2020, the campaign expanded to address the stress placed on members working during the pandemic and the lack of personal protective equipment ("PPE") available to EMS during the pandemic.  *Id.* ¶ 32.

At the request of Barzilay, Pfeiffer and Bonilla agreed to participate in a series of press videos and articles in April 2020 about the COVID-19 pandemic and how it was being handled

by the FDNY.  *Id.* ¶ 29.  Nunez also agreed to be interviewed by the Australian Broadcasting

Corporation ("Aus. BC") at the request of Rugen.  *Id.* ¶ 30.

## V.    **The Australian Broadcasting Corporation Visits and Report**

In early April 2020, Local 2507 received a request from a reporter at Aus. BC for help in

reporting on the workday burdens of FDNY EMTs and paramedics.  The reporter asked for help

following FDNY EMTs and paramedics at work, and Local 2507 agreed to provide that

assistance.  Dkt. No. 72 ¶ 13.  Barzilay asked Rugen to get time off on April 10 and 11, 2020, in

order to assist the Aus. BC team observe the work of some FDNY EMTs and paramedics.

Rugen requested the time off from his supervisor, who granted the request and approved the

leave in New York City's electronic timekeeping system, "Citytime."  *Id.* ¶ 14.  Plaintiffs Nunez

and Pfeiffer were featured in an Aus. BC interactive news publication—a video with text overlay

accompanied by an article with still images—that was filmed on April 10 and 11, 2020, Dkt. No.

71 ¶ 8; they were depicted in their EMS uniforms and performing patient care, *id.* ¶ 10.

On the morning of April 10, 2020, Barzilay discussed with Aus. BC reporters that they

could set up in public areas and film EMTs and paramedics at work.  Dkt. No. 72 ¶ 15.  That

same day, Rugen used his personal vehicle to take two Aus. BC reporters to follow an FDNY

ambulance to a location where the ambulance crew was responding to a call.  *Id.* ¶ 16.  Rugen

did so at the request of Barzilay, with the goal of granting the film crew the ability to film how

active EMS teams responded to the pandemic and what they were dealing with in their work

capacities.  Dkt. No. 71 ¶ 61.  Rugen and the Aus. BC team followed the EMS crew comprised

of plaintiff Pfeiffer and her work partner, FDNY paramedic Rick Nauth.  Dkt. No. 72 ¶ 16.

During the visit, but while she was not working, Pfeiffer spoke to the Aus. BC team about the

difficulties she faced working as a paramedic during the pandemic.  *Id.* ¶ 20.  At the site, Pfeiffer

and Nauth entered a residential building to treat a patient.  *Id.* ¶ 18.  The Aus. BC team exited

Rugen's car and followed the EMS crew.  *Id.* ¶ 17.  Rugen originally understood that the Aus.

BC team would be observing and photographing from the sidewalk or another position available

to the public, as other members of the press did on a regular basis.  *Id.*  However, Rugen learned

that the Aus. BC team, rather than remaining outside in public areas, had entered the same

building that the EMS crew had entered.  *Id.* ¶ 18.  Rugen entered the building, intercepted the

Aus. BC team, and told them that they could not enter and must remain outside in public areas.

*Id.*  The Aus. BC team informed Rugen that they had received authorization from the patient's

family to enter the residence and film, and they declined to exit.  *Id.*  Neither Rugen nor the EMS

crew authorized, consent to, or encouraged the Aus. BC team to enter the residence.  *Id.* ¶ 19.

Neither Rugen, Local 2507, Barzilay, nor the EMS crew themselves obtained authorizations

from the individuals being filmed.  Dkt. No. 71 ¶¶ 60, 62.

The following day, April 11, 2020, Rugen again assisted the Aus. BC team in its effort to

film EMTs and paramedics while they worked.  Dkt. No. 72 ¶ 21.  With the Aus. BC team in his

car, Rugen followed an ambulance, staffed by Nunez and his work partner Paramedic O'Neal,

who was dispatched to a call.  *Id.*  Outside a residential building that the EMS crew had entered

in order to render care, the Aus. BC team told Rugen that they wanted to enter the building, but

Rugen told the Aus. BC crew not to do so and alerted an FDNY supervisor at the scene that he

had told the Aus. BC crew not to enter.  *Id.*  Subsequent to that conversation, the Aus. BC team

entered the residential building.  *Id.*  Rugen later learned that the Aus. BC team had obtained

authorization to enter the building from residents of the apartment in which the patient was being

treated.  *Id.*  Neither Rugen nor the EMS crew at the scene authorized, consented to, or

encouraged the Aus. BC team to enter the residence.  *Id.* ¶ 22.  Nunez was not even aware that

the Aus. BC team had entered the residence until after he had completed treating the patient and

left the building. *Id.* During a period while he was not working, Nunez spoke to the Aus. BC team about the difficulties he faced working as a NYC paramedic during the pandemic. *Id.* ¶ 23.

On April 20, 2020, Aus. BC published a video/article entitled "Behind Enemy Lines New York." *Id.* ¶ 25. Pfieffer and Nunez were featured in the video that accompanied the article; the video showed EMS members walking down a residential hallway and entering an apartment, with Pfeiffer and Nunez in their EMS uniforms performing patient care. Dkt. No. 71 ¶¶ 8–10. The video also showed the patient being removed from the residential building and placed into an ambulance and Nunez making a telephone call, and it was accompanied by an overlay text describing the patient, the patient's physical condition, the interior of the apartment, the treatment being provided to the patient, and the reporter's interpretation of the events. *Id.* ¶¶ 12–14. In one of the still photos that accompanied the article, the number affixed to the building is visible—though the identity of the street is not—and in two of the still photos, Rugen can be seen sitting in a vehicle outside the residential building. *Id.* ¶¶ 16–17. The accompanying article indicated that Rugen was taking the Aus. BC for a ride-along following Pfeiffer and her partner, and Nunez is quoted as stating that he and his colleagues did everything they could to prevent a patient's death. *Id.* ¶¶ 18–19.

Rugen did not provide prior notice to the FDNY that he was going to escort the media on a ride-along and neither he, Pfeiffer, nor Nunez informed the FDNY that they were going to speak to the media. *Id.* ¶¶ 20–22.

## VI. The Associated Press Visit and Report

On April 15, 2020, a film crew from the Associated Press ("AP") followed an FDNY ambulance staffed by Bonilla and her work partner to observe the work of FDNY paramedics. Dkt. No. 72 ¶ 26. Bonilla did not inform the FDNY before she spoke to the press. Dkt. No. 71 ¶ 27. Bonilla spoke to the AP reporters prior to the start of her shift, and, at one point during her

shift, a cameraman filmed Bonilla on a sidewalk outside of the house of a patient she had tried to save.  Dkt. No. 72 ¶ 27.  As she walked to her ambulance, Bonilla expressed distress to the reporter over the fate of the patient.  *Id.*  The entire interaction with the reporter in which Bonilla expressed her distress lasts twenty-three seconds.  *Id.* ¶ 28.

Shortly after April 15, 2020, AP published a video, which aired on Fox News and MSN, that included Bonilla's expression of distress.  *Id.*; Dkt. No. 71 ¶ 23.  In the video, Bonilla can be seen in uniform and standing near an FDNY ambulance which has its lights blinking and is parked outside a residence.  Dkt. No. 71 ¶ 24.  The outside of the residence is seen, along with its occupants.  *Id.* ¶ 25.  As Bonilla walks past a reporter, she is in tears and states, in part: "This one is hard, real hard.  So young.  Young kids, youngest boy is three and you can't do nothing."  *Id.* ¶ 26.

The AP article is entitled "'You Hear the Cries': Virus Toll Haunts a New York Paramedic" and reports on AP's observations as it followed Bonilla through the first half of her sixteen-hour double shift.  *Id.* ¶ 78.  The article quotes Bonilla as saying: "We gotta gown up," as she climbs out of an ambulance and then enters one of a set of Bronx row houses.  It also contains quotations from her as she exits the house about 50 minutes later.  She states: "This one is hard.  Real hard," and "I don't think that anyone was prepared for this."  *Id.*  It also reports that she and her partner had often been working two shifts per day and making between five and seven calls each shift.  She states: "It's the eye of the storm."  She also states that she replays in her head at home the calls from the prior day:  "You hear the cries.  You just hear and you see everything all over again" but that "[y]ou want to make sure you're strong for them."  *Id.*

Around this time, Bonilla also spoke to other news outlets about the toll the pandemic was taking on her, including her inability to see her parents.  *See id.* ¶ 79.  She was not working during these other interviews.

## VII.   The DOI Referral

In April 2020, OHCC received a report of the Aus. BC, Fox News, and MSN media clips and articles, *id.* ¶ 45, and determined that further investigation was needed to determine if there was a breach of HIPAA by the FDNY personnel featured in the articles and videos, *id.* ¶ 47.

The OHCC's decision to investigate is a matter of dispute between the parties.  Citing evidence, Defendants state that OHCC was concerned about the following PHI being depicted in the Aus. BC video: the exterior and interior of the residence, which could reasonably lead to the identification of the patient; the patient's face and body was visible as she was receiving treatment from the EMS members; the type of treatment was visible, and her death was revealed. *Id.* ¶ 49.  Defendants state that the depiction of the exterior of the patient's house in the Fox/MSN News video could reasonably lead to the identification of the patient and that the patient's age was revealed in the video.  *Id.* ¶ 50.  OHCC was not in possession of any authorization from the patient or patient's family that consent had been provided to EMS such that PHI could be disclosed to the press or other third parties.  *Id.*  Plaintiffs do not dispute that members of the OHCC stated that the reason for the investigation was concern regarding violations of regulations governing PHI but argue both that that was not the genuine reason and that the information shown would not have reasonably led to patient identification.  Dkt. No. 64 at 22–23.  They do not identify any direct evidence of a reason for investigation other than concern regarding violations of the regulations governing PHI.

On April 20, 2020 and at the direction of Velez, Bianca Kodzoman ("Kodzoman"), an Associate Disciplinary Counsel in BITS, wrote to DOI referring Bonilla to DOI; the referral

stated that there were "multiple alleged HIPAA violations in that Paramedic Elizabeth Bonilla allowed a news crew to follow her during a tour and she discussed and allowed filming during patient care" on April 15, 2020.  Dkt. No. 72 ¶¶ 82–84.  It further noted that Bonilla's conduct "was not authorized or discussed with FDNY's Legal or Public Information" and that it "potentially involves multiple members and/or officers."  Dkt. No. 71 ¶ 77; *see also* Dkt. Nos. 49-10, 59-21.  The communication contained links to three media reports.[1]  Dkt. No. 71 ¶ 78.  Bonilla was not notified of the April 20, 2020 referral to DOI and only learned of it during the course of this litigation.  Dkt. No. 72 ¶ 86.  Bonilla's partner was not reported because the partner was not quoted in the news articles or videos.  *Id.* ¶ 89.

Two days later, on April 22, 2020, Kodzoman wrote to DOI concerning Rugen, Pfeiffer, and Nunez, referring their cases to DOI on the basis of what were claimed to be "multiple alleged HIPAA" violations on April 10, 2020, related to the Aus. BC article.  *Id.* ¶¶ 90–91; Dkt. Nos. 49-9, 59-22.  Among other things, the text of the referral stated: "Video of an apartment in Queens identifying the following information: apt #, patient's face, body and inside of apartment, describes her medical condition, and date (4/10 Good Friday)."  Dkt. No. 71 ¶ 81; *see also* Dkt. Nos. 49-9, 59-22.  The referral linked to an online version of the Aus. BC article.  Dkt. No. 72 ¶ 91.  Rugen, Pfeiffer, and Nunez were not notified of the April 22, 2020, referral and learned of it only during this litigation.  *Id.* ¶ 92.  None of these Plaintiffs' partners were reported because they were not quoted in the articles and videos.  *Id.* ¶ 94.

---

[1] The media reports were: (1) https://www.fox5ny.com/news/nyc-paramedic-haunted-by-coronavirus-toll-you-hear-the-cries; (2) https://www.fox5ny.com/video/675273.amp; and (3) https://www.msnbc.com/hallie-jackson/watch/fdny-paradmedic-on -anxiety-and-adrenaline-of-treating-covid-19-patients-82206789803.

**VIII.   The Imposition of Restrictions and Discipline on Plaintiffs**

On April 26, 2020, shortly after the referrals, Rugen, Pfeiffer, Nunez, and Bonilla were notified that they were restricted from performing patient care/field-related duties and from driving any FDNY vehicles until further notice.  Dkt. No. 48 ¶¶ 17, 26, 30, 36.  In addition, Rugen was suspended from duty for twenty-eight days.  *Id.* ¶ 16.  Rugen was informed that "[t]he suspension is based on your violation of FDNY's Social Media and HIPAA Privacy Policies, New York State Public Health Law and Federal Patient Privacy Law/Regulations on or about April 10, 2020."  *Id.* ¶ 18; Dkt. No. 72 ¶ 67.  Velez made the decision to restrict the employment of Rugen, Bonilla, Nunez, and Pfeiffer.  Dkt. No. 72 ¶¶ 41, 64.  The parties dispute the reasons for Velez's decision to restrict Bonilla, Nunez, and Pfeiffer, and to restrict and suspend Rugen.  Velez testified that he made the decision to suspend and restrict Rugen and to restrict the other three Plaintiffs because of what he understood to be their apparent violation of FDNY rules and regulations regarding privacy and HIPAA rules and regulations, including Bonilla's commenting on patient healthcare and information, that she allowed the media to follow her without alerting the Press Office, and that she spoke to the media in violation of the Press Policy.  *Id.*; Dkt. No. 59-6 at 15:4–17:8, 21:14–22:23, 38:18–39:2, 40:22–42:8, 44:25–46:14, 62:21–63:19, 70:14–22; Dkt. No. 59-7 at 55:8–56:15; Dkt. No. 59-12 at 26:24–27:10, 54:4–14.

The prior day, April 25, 2020, FDNY Director of Labor Relations, David Zweiffler ("Zweiffler"), telephoned Barzilay to inform him that Rugen, Pfeiffer, Nunez, and Bonilla were about to be restricted.  Dkt. No. 72 ¶ 75.  Zweiffler stated that the restrictions were the result of "some instances of unauthorized interviews or assistance with a film crew that was unauthorized or improper."  *Id.*  On April 27, 2020, counsel for Local 2507, Walter Meginniss ("Meginniss"), wrote to Brown concerning the suspension of Rugen and the restrictions of Rugen, Pfeiffer,

Nunez, and Bonilla. *Id.* ¶ 76. Meginniss complained that the FDNY had yet to disclose the grounds upon which it had taken action against the EMTs and paramedics and requested that discipline not be imposed until a discussion of the allegations of misconduct could take place. *Id.* ¶¶ 76–77. The letter also set out Local 2507's belief as to why the FDNY had taken its April 26 actions and asserted that the factual assumptions made by the FDNY that ostensibly formed the basis for its actions were false. *Id.* ¶ 78.

Brown responded to the letter on April 28, 2020. *Id.* ¶ 79. She stated that the measures taken by the FDNY against Plaintiffs were commonly utilized by city agencies and consistent with FDNY practice. *Id.* She did not address the factual assertions and conjecture in the Meginniss letter. *Id.* She also did not provide any information on the reasons the measures were taken against Plaintiffs and did not offer an opportunity for Plaintiffs to respond to allegations that they had engaged in misconduct. *Id.* The FDNY sent no other response to the Meginniss letter. *Id.* Local 2507 officials suspected that the FDNY had acted against Plaintiffs because the Aus. BC team had entered the residences of the patients while those patients were being treated and had filmed the treatment. *Id.* ¶ 80. Rugen obtained copies of the authorizations the Aus. BC reporters had obtained from the patients and, on May 15, 2020, Local 2507 forwarded to the FDNY copies of those authorizations. *Id.* ¶ 81. The restrictions on Rugen, Pfeiffer, Nunez, and Bonilla were not lifted for over a month after Rugen sent the authorizations.

While their employment was restricted, each of the individual Plaintiffs received their regular rate of pay for the hours they worked. Dkt. No. 71 ¶¶ 110, 117, 122, 126. While on restricted status, Rugen underwent training, was provided access to the Computer Assisted Dispatch Voluntary Access System ("CAD VACS") to complete his training, could utilize departmental phones, and assisted in the Resource Coordination Center. *Id.* ¶ 110. However,

Plaintiffs were not permitted to work overtime for FDNY.  Dkt. No. 48 ¶¶ 59–62.  They were not able to earn the overtime, night-shift differential, meal, or holiday pay defined as benefits under the CBA.  Dkt. No. 71 ¶¶ 109, 114, 120, 125.  Bonilla was not permitted to wear her FDNY uniform and reported to her regular duty stations in civilian clothes; she also was not given any work assignments.  Dkt. No. 72 ¶ 33.  Nunez was not permitted to wear his FDNY uniform, his hours were reduced, and he was required to work at a different location—the pharmacy—than the station where he had been working.  *Id.* ¶ 37.  Pfeiffer was also not permitted to wear her FDNY uniform and was required to work at the pharmacy rather than the station at which she had been working.  *Id.* ¶ 40; Dkt. No. 71 ¶ 116.  Consistent with common practice at the FDNY, the notice that Plaintiffs received communicating that their employment was restricted included no statement of reasons for the restriction.  Dkt. No. 48 ¶¶ 65, 67, 69, 71.

The restrictions imposed on Plaintiffs also affected their ability to work within the New York City 911 system (the "911 System").  The FDNY manages the system for responding to 911 calls in New York City for emergency medical assistance.  Dkt. No. 72 ¶ 97.  Such calls may be responded to by FDNY EMTs and paramedics, or by EMTs and paramedics employed by voluntary hospitals who participate in the 911 System.  *Id.* ¶¶ 97–98.  However, in order to be able to respond to a call for emergency medical assistance through the 911 System, an approved EMT or paramedic must have a CAD VACS identification number.  *Id.* ¶ 99.  When an EMT or paramedic's CAD VACS number is suspended, that EMT or paramedic may not respond to calls for emergency medical assistance in the 911 System.  *Id.* ¶ 101.  If the restricted EMT or paramedic also holds employment in a participating voluntary hospital, the FDNY will inform that hospital's ambulance department that the individual's CAD VACS has been restricted and the employee will not be able to log in to receive assignments in the 911 System.  *Id.* ¶¶ 103–

104.  Those employees then would not be permitted to drive an ambulance that requires a CAD

VACS.  *Id.*  The notification contains the individual's name and unique four-digit identification

number and whether the restriction was a medical, operational, or driving restriction.  Dkt. No.

71 ¶ 141.  Other than notifying the employer-hospital of the CAD VACS restriction, the FDNY

does not otherwise inform, instruct, or direct the employer-hospital as to what work it can or

cannot assign an ex-departmental employee—an EMT or paramedic who is employed by the

FDNY but also holds additional employment for a hospital, *id.* ¶ 137—or how to otherwise treat

the employee.  *Id.* ¶ 146.  If the FDNY EMT or paramedic does not hold outside employment

with a hospital, then no notification is sent out.  *Id.* ¶ 140.  The CAD VACS restriction does not

prevent an ex-departmental employee from responding to non-911 emergency or medical related

calls, operating non-CAD VACS ambulances or performing any other task the employer-hospital

assigns to the employee.  *Id.* ¶ 145.  It is not disputed that, at the time of their restrictions,

Plaintiffs were not ex-departmental employees.  *Id.* ¶ 148.

## IX.    The Lifting of the Restrictions

The complaint in this action was filed on June 10, 2020, and it was served on the City of

New York and Fire Department Commissioner Nigro on June 11, 2020.  Dkt. No. 72 ¶ 110.  The

same day, Saunders wrote to Rugen ordering Rugen to appear for an interview on June 17, 2021.

*Id.* ¶ 111.  An email sent by Saunders to Rugen's counsel stated that the interview would "among

other things, seek[] to determine whether the FDNY in its role as a covered entity/health care

provider and through its employee, John Rugen, permitted media and film crews to access

patients' protected health information (PHI) without the patients' prior authorization."  Dkt. No.

71 ¶ 65.  At the June 17, 2020, interview, Rugen was represented by counsel.  *Id.* ¶ 64.  As part

of the investigation, Saunders also interviewed Barzilay.  *Id.* ¶ 66.

Upon receiving notification by DOI that it would not be investigating the matter, Velez directed Kodzoman to lift the restriction placed on Nunez, Bonilla, and Pfeiffer. *Id.* ¶ 102.  On June 17, 2020, following the Saunders interview with Rugen, the restrictions on Pfeiffer, Nunez, and Bonilla were lifted and they were informed that they could resume performing patient care/field related duty and driving Department vehicles.  Dkt. No. 48 ¶¶ 27, 31, 37; Dkt. No. 72 ¶ 117.  Each was permitted to resume his/her full duties.  Dkt. No. 72 ¶ 46.  The notice informing Plaintiffs that the restrictions were lifted did not include any statement of reasons as to why the restrictions had been imposed and did not include any statement of reasons as to why the restrictions had been lifted.  Dkt. No. 48 ¶¶ 66, 68, 70, 75.  All in all, the three individuals were restricted for a period of fifty-three days.

As a matter of practice, after the FDNY lifts a restriction that has been imposed on a EMT or paramedic, the FDNY does not compensate the individual for any overtime or allowances lost as a result of the restriction, even if the FDNY has determined that no misconduct occurred in connection with the incident that led to the restriction.  Dkt. No. 72 ¶ 62.

In a notice dated May 26, 2020, Rugen was notified that his suspension was lifted effective May 22, 2020, and that his restrictions from performing patient care/field related duties and driving Department vehicles remained in effect until further notice.  Dkt. No. 48 ¶ 19; Dkt. No. 72 ¶ 71.  Velez lifted the restriction on Rugen when he determined that Rugen would not be facing termination.  Dkt. No. 71 ¶ 103.  On June 19, 2020, the restriction on Rugen's duties was lifted, and he was allowed to resume his patientcare/field related duties and to drive Department vehicles.  Dkt. No. 48 ¶ 21; Dkt. No. 72 ¶ 73.  That notice advising Rugen that his restriction had been lifted did not include any statement of the reasons why it had been imposed or why it had

been lifted.  Dkt. No. 72 ¶ 73.  Rugen was restricted for a period of fifty-five days and suspended for twenty-eight days.

Although the restrictions were lifted on June 17, 2020, the FDNY continued to investigate the conduct of Plaintiffs that led to those restrictions.  *Id.* ¶ 121.  Ultimately, the FDNY issued no formal charges against any of the individual Plaintiffs arising out of the conduct that led to the April 26, 2020 restrictions of their employment.  *Id.* ¶¶ 137–140.  It concluded that there was no violation of HIPAA or the New York State Public Health Law (although the bases for that conclusion are disputed).  Dkt. No. 71 ¶ 68.  On October 21, 2021, BITS notified Rugen that (1) it was rescinding the suspension it had imposed on him for the period of April 26, 2020, through May 23, 2020, and would be remunerating him "for the equivalent pay that was withheld" during the period of suspension, and (2) with respect to the rescission and remuneration, it had concluded its action in the matter.  Dkt. No. 77 at 1; Dkt. No. 77-1.  In addition, on the same day, BITS also informed the Union that it was administratively closing its investigation of the conduct of all of the individual Plaintiffs that are the subject of this litigation. Dkt. No. 77 at 1.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most

favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).

Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

"[W]hen multiple parties cross-move for summary judgment, . . . 'each party's motion must be examined on its own merits and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *Century Sur. Co. v. Franchise*

*Contractors, LLC*, 2016 WL 1030134, at *3 (quoting *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

## DISCUSSION

Plaintiffs Rugen, Nunez, Pfeiffer, and Bonilla allege that Defendants retaliated against them for engaging in protected speech.  Specifically, they allege that, after engaging with the news media about the COVID-19 pandemic and the experiences of EMTs and paramedics, and because of their communications with the news media, Defendants restricted the individual Plaintiffs' employment or otherwise took adverse employment action against them.  Local 2507 alleges that the imposition of adverse actions against its members, and the consequent chilling effect on their free speech, interferes with Local 2507's exercise of its First Amendment rights because it relies on its members' participation to support its effective communication with the public.

Plaintiffs further allege that the actions taken against them with respect to their employment were done without notice and a prior opportunity to be heard, depriving them of property and liberty interests without due process of law.  Defendants seek summary judgment on Plaintiffs' claims, and Plaintiffs seek for summary judgment on their liberty-interest due-process claim.

## I.     First Amendment Retaliation

Defendants move for summary judgment on Plaintiffs' claims for First Amendment retaliation.  They argue that Plaintiffs' relevant speech was not made either in their capacity as private citizens or on a matter of public concern.  Defendants also argue that, even if the Plaintiffs' speech was protected by the First Amendment, they cannot be liable for retaliation because (1) they would have taken the same adverse action even in the absence of protected speech, and (2) the disruption caused by Plaintiffs' speech outweighs the value of the speech and

any adverse employment action was thus permissible under *Pickering v. Board of Education*, 391 U.S. 563 (1968).  Finally, Defendants argue that Velez is entitled to qualified immunity regarding Plaintiffs' First Amendment retaliation claims because, during the pertinent time period, it was not clearly established that a person speaking in his or her capacity as a union member speaks as a private citizen, and thus the right to First Amendment protection from retaliation had not been "clearly established."  Dkt. No. 63 at 20–24.

"To survive summary judgment on a First Amendment retaliation claim, a public employee 'must bring forth evidence showing that [1] he has engaged in protected First Amendment activity, [2] he suffered an adverse employment action, and [3] there was a causal connection between the protected activity and the adverse employment action.'"  *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011).  "[T]he causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action."  *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006) (quoting *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994)); *see also Morrison v. Johnson*, 429 F.3d 48, 51 (2d Cir. 2005) (framing the third, "causation" prong as asking whether "the speech was at least a substantial or motivating factor in the adverse employment action" (quoting *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003))); *Houston Community College Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022) ("'[A]s a general matter,' the First Amendment prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." (quoting *Nieves v. Barlett*, 139 S. Ct. 1715, 1722 (2019))).

Defendants do not appear to contest that the individual Plaintiffs have adduced sufficient evidence to satisfy the second and third prongs—that they suffered an adverse employment

action and that—assuming they engaged in protected First Amendment protected activity, there would be a causal connection between their protected activity and the adverse employment action taken against them.  As to Plaintiff Local 2507, they argue that the Union has not demonstrated an adverse action or chilling effect on their speech.  As to the individual Plaintiffs, Defendants claim that there is insufficient evidence with respect to the first prong.  They argue that Plaintiffs have not established that they engaged in protected First Amendment activity and that, even if they had, there is no genuine factual dispute that Defendants are entitled to judgment based on the defenses set forth in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977), and *Pickering v. Board of Education*, 319 U.S. 563, 568 (1968). Under the *Mt. Healthy* defense, "[e]ven if the plaintiff demonstrates [the above] factors, the defendant can still prevail on a motion for summary judgment if it can show that it would have taken the same adverse employment action even in the absence of the protected conduct." *Cotarelo*, 460 F.3d at 252 (internal quotation marks and citation omitted); *see also Mt. Healthy*, 429 U.S. at 287 (holding that, if plaintiff carries burden of showing that constitutionally protected conduct was a substantial factor in an adverse employment action, the district court should consider whether defendant has "shown by a preponderance of the evidence that it would have reached the same decision as to [the adverse employment action] even in the absence of the protected conduct").  Under the *Pickering* balancing test, "defendants may . . . escape liability if they can demonstrate that . . . the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression."  *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138, 140 (2d Cir. 2008).

### A.      Whether the Speech was Protected by the First Amendment

The first prong—whether an employee's speech was entitled to First Amendment

protection from retaliation[2]—requires a two-part inquiry.  First, a court will consider "whether

the subject of the employee's speech was a matter of public concern." *Jackler v. Byrne*, 658

F.3d 225, 235 (2d Cir. 2011) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 420–22, 424 (2006)).

"Whether speech is on a matter of public concern presents a question of law that takes into

consideration the content, form, context of a given statement." *Specht v. City of New York*, 15

F.4th 594, 600 (2d Cir. 2021); *see also Connick v. Myers*, 461 U.S. 138, 147 (1983) ("Whether

an employee's speech addresses a matter of public concern must be determined by the content,

form, and context of a given statement, as revealed by the whole record.").  "In considering

content, form, and context, no factor is dispositive, and it is necessary to evaluate all the

circumstances of the speech, including what was said, where it was said, and how it was said."

*Snyder v. Phelps*, 562 U.S. 443, 454 (2011).  "Speech deals with matters of public concern when

it can be fairly considered as relating to matters of political, social, or general interest to the

community or value and concern to the public." *Specht*, 15 F.4th at 600; *see also Jackler*, 658

F.3d at 236 ("[A] topic is a matter of public concern for First Amendment purposes if it is 'of

general interest,' or 'of legitimate news interest,' or 'of value and concern to the public at the

---

[2] As Judge Leval noted in *Lynch v. Ackley*, 811 F.3d 569 (2d Cir. 2016), the threshold question is
not whether the speech generally comes within the protection of the First Amendment but rather
whether the speech is constitutionally protected from retaliation in the government employment
context.  The two are different.  Judge Leval explained:

> Courts sometimes characterize the determinative question in §1983 First
> Amendment retaliation suits as whether the employee speech at issue was
> 'constitutionally protected.'  In most cases, such words seem intended as shorthand
> for whether the speech was constitutionally protected *from employer retaliation*.
> The test for establishing unconstitutional retaliation for an employee's speech is far
> more stringent than the test for establishing that speech enjoys protection under the
> First Amendment.

*Id.* at 578 n.8.

time' of the speech." (quoting *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 83–84 (2004))).  This

standard applies both to verbal speech as well as an employee's expressive conduct.  *See*

*Piscottano v. Murphy*, 511 F.3d 247, 270 (2d Cir. 2007).

       "Speech that, although touching on a topic of general importance, primarily concerns an

issue that is 'personal in nature and generally related to the speaker's own situation,' such as his

or her assignments, promotion, or salary, does not address matters of public concern."  *Jackler*,

658 F.3d at 236 (alteration adopted) (quoting *Ezekwo v. NYC Health & Hosps. Corp.*, 940 F.2d

775, 781 (2d Cir.), *cert. denied*, 502 U.S. 1013 (1991)).  That is, if "a public employee speaks

not as a citizen upon matters of public concern, but instead as an employee upon matters only of

personal interest . . . a federal court is [generally] not the appropriate forum in which to review

the wisdom of a personnel decision taken by a public agency allegedly in reaction to the

employee's behavior."  *Connick*, 461 U.S. at 147.  The Second Circuit has held that statements

made to an employee's supervisor or other employer officials that "relat[e] only to internal

employment policies of an employer," *Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir.

2008), or vague internal complaints made to co-workers regarding perceived pressure by

supervisors that would "convey no information other than the fact that a single employee was

upset by an incident that occurred in the workplace," *Specht*, 15 F.4th at 601, constitute

employee grievances that are not a matter of public concern.  *See Singh*, 524 F.3d at 372

(concluding that plaintiff was not speaking on a matter of public concern when he voiced

concerns to his supervisors and fire department officials regarding City's policy of requiring

inspectors to carry their inspection documents to and from work and policy of retaining

inspectors in "provisional" status for longer than nine months); *cf. Reuland v. Hynes*, 460 F.3d

409, 418 (2d Cir. 2006) (concluding that statement addressed a matter of public concern where it

"did not relate to employment policies or other internal workplace grievances" and "was made in an interview with a magazine with public circulation and not simply to co-workers"). But, again, the "content, form, and context" are important, *Connick*, 461 U.S. at 147, and statements made regarding the same topic may constitute speech on a matter of public concern or an internal workplace grievance, depending on the content, form, and context of the speech. *See Specht*, 15 F.4th at 601 (concluding that employee's email to fellow fire marshals of his reaction to perceived inappropriate pressure of supervisors was an "internal workplace grievance" but that statements made to external entities—including the press—regarding this inappropriate pressure and improper handling of an investigation implicated a matter of public concern).

"[A] speaker's motive is not dispositive in determining whether his or her speech addresses a matter of public concern." *Sousa v. Roque*, 578 F.3d 164, 173 (2d Cir. 2009) (citing *Reuland*, 460 F.3d at 415 (2d Cir. 2006)). Indeed, "an individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large," *Specht*, 15 F.4th at 600 (quoting *Golodner v. Berliner*, 770 F.3d 196, 203 (2d Cir. 2014)), and thus "a person who is 'motivated by a personal grievance' can still 'be speaking on a matter of public concern,'" *Bourne v. City of Middletown*, 2017 WL 1138125, at *5 (D. Conn. Mar. 27, 2017) (quoting *Sousa*, 578 F.3d at 173–74). Nor is all speech that is privately discussed automatically immune from being characterized as speech on a matter of public concern. *See Ezekwo*, 940 F.2d at 781 ("The mere fact that a public employee chooses to discuss privately his concerns with his employer as opposed to expressing his views publicly does not alter the analysis.").

The second inquiry is "whether the employee spoke 'as a citizen' rather than solely as an employee." *Jackler*, 658 F.3d at 235 (quoting *Garcetti*, 547 U.S. at 422). This question "is also largely a question of law for the court." *Id.* at 237. The answer to this question does not depend

26

on whether an employee's speech concerned the subject matter of his employment. "The First Amendment protects some expressions related to the speaker's job," *Garcetti*, 547 U.S. at 421, for oftentimes it is those who are in public employment whose speech arising from their employment contributes the most to the public discourse and is of greatest public concern. "In other words, the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech," unprotected from retaliation under the First Amendment. *Lane v. Franks*, 573 U.S. 228, 240 (2014). Rather, the question is whether a public employee is "mak[ing] statements pursuant to [his] official duties," *Garcetti*, 547 U.S. at 421, "not whether it merely concerns those duties," *Lane*, 573 U.S. at 240. If employees make statements pursuant to their official duties, "the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. As the *Garcetti* Court explained "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421–22. Thus, "speech can be pursuant to a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir. 2010) (internal quotation marks omitted).

In determining whether a public employee is speaking pursuant to his employment responsibilities, a court also considers whether speech made by an employee has a civilian analogue. *See Garcetti*, 547 U.S. at 423–24. The *Garcetti* Court explained:

> Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government. The same goes for writing a letter to a local newspaper . . . . When a public employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to speech by citizens who are not government employees.

*Id.* at 423; *see also Jackler*, 658 F.3d at 241; *Weintraub*, 593 F.3d at 203 ("Our conclusion that Weintraub spoke pursuant to his job duties is supported by the fact that his speech ultimately took the form of an employee grievance, for which there is no relevant civilian analogue."). While the question whether speech has a citizen analogue is important, it is not dispositive; the fact that the employee's speech does not have a citizen analogue is relevant to the determination whether the speech was made pursuant to the employee's official duties but not necessarily conclusive of that issue. *See Weintraub*, 493 F.3d at 204 ("Although the lack of a citizen analogue is 'not dispositive' in this case, [*Garcetti*, 547 U.S.] at 420, it does bear on the perspective of the speaker—whether the public employee is speaking as a citizen . . . ."); *see also Montero v. City of Yonkers*, 890 F.3d 386, 398 (2d Cir. 2018) (holding that the district court was "correct in deciding that the lack of a civilian analogue was not critical to a decision as to whether Montero spoke as a private citizen"). Thus, when a public employee makes statements (1) pursuant to his official duties and (2) that have no relevant analogue to speech by civilians who are not government employees, "the government employee's speech is not protected by the First Amendment." *Jackler*, 658 F.3d at 229. "The matter of whether the government employee's duties do or do not have a civilian analogue is a question of law." *Id.* at 238.

*Garcetti* concerned a deputy district attorney, Ceballos, who alleged he was subject to adverse employment actions as a result of a memorandum to his supervisor recommending dismissal of a case—a recommendation made after concluding that a police affidavit used to obtain a critical search warrant contained serious misrepresentations. *Garcetti*, 547 U.S. at 414–

15. The Supreme Court rejected his First Amendment claim, concluding that Ceballos'
expressions were made pursuant to his duties as a deputy:

> Ceballos wrote his disposition memo because that is part of what he, as a calendar
> deputy, was employed to do. . . . The significant point is that the memo was written
> pursuant to Ceballos' official duties. Restricting speech that owes its existence to a
> public employee's professional responsibilities does not infringe any liberties the
> employee might have enjoyed as a private citizen. It simply reflects the exercise of
> employer control over what the employer itself has commissioned or created.

*Id.* at 421–22. The Court noted that the fact that Ceballos expressed his views inside his office
rather than publicly and that his memo concerned the subject matter of his employment were
nondispositive, albeit still important. *Id.* at 420–21. "The *controlling factor* in Ceballos' case is
that his expressions were made pursuant to his duties as a calendar deputy." *Id.* (emphasis
added).

Following *Garcetti*, the Second Circuit has had multiple occasions to consider first
"whether a public employee's speech touches on a matter of public concern," *Specht*, 15 F.4th at
600, and second whether that speech was made as an employee or a private citizen. As to the
"public concern" prong, in *Jackler*, 658 F.3d 225, the Circuit reversed the dismissal of a First
Amendment retaliation claim brought by a probationary police officer who alleged he was
dismissed after refusing to file a false report regarding an arrest he witnessed in his role as an
officer. In reversing, the Circuit explained that exposure of official misconduct, and particularly
misconduct within the police department, "is plainly a matter of public concern," *id.* at 237, and
that the officer's refusal to file a false report was not motivated by a personal interest and the
events taking place during the underlying arrest did not implicate his ability to do his job
properly, *id.* at 241.

In *Specht*, the Second Circuit held that a fire marshal's internal email to other fire
marshals concerning the course of a fire investigation and pressure from supervisors to

prematurely terminate his work and file a false report regarding the cause for the fire constituted "internal workplace grievances, not matters of public concern." 15 F.4th at 601. However, the Circuit held that the marshal's complaint to the New York City Department of Investigation, his Notice of Claim with the City, his meeting with representatives from the District Attorney's office, and his communications with the local press about his investigation and his supervisors' demands all touched on matters of public concern since his reports "to outside agencies . . . implicate[d] matters of public importance" and "relate to possible governmental malfeasance, public safety, as well as to the public fisc." *Id.* at 601–02. Further, the Circuit found that the fire marshal's refusal to file a false report touched on matters of public concern because, just like his reports to outside agencies, the action "pertain[ed] to . . . potentially serious governmental misconduct." *Id.* at 602. Finally, the Circuit held that the marshal's reports to outside agencies and refusal to file a false report did not occur in his capacity as an employee because neither was "part-and-parcel" of his duties, *id.* at 604 (internal quotation marks omitted); his actions more accurately described a citizen refusing to violate the law and reporting on government misconduct to the public, *id.* Thus, the fire marshal's speech constituted protected First Amendment activity.

Similarly, in *Matthews v. City of New York*, the Second Circuit held that an officer speaking to his commanding officers about an arrest quota policy spoke as a citizen because his "policy-oriented speech was neither part of his job description nor part of the practical reality of his everyday work." 779 F.3d 167, 174 (2d Cir. 2021). The court stated that "when a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as

a citizen, not as a public employee." *Id.* In so holding, the Circuit explained that the officer's speech had a comparable civilian analogue—"support[ing] [its] conclusion that he spoke as a citizen"— because, despite having greater access to commanding officers, his speech involved "a path that was available to ordinary citizens who are regularly provided the opportunity to raise issues with the Precinct commanders." *Id.* at 175–76.

The Circuit has also examined the question in the context of speech by employees who belong to a labor union. In *Montero*, for example, the Second Circuit decided that a police officer's comments at union meetings criticizing the police commissioner's management of the police department and calling for a no-confidence vote as a result of decisions to discontinue certain police units touched the public's concern. 890 F.3d 386. The Circuit explained that the termination of police units and the alleged resulting detriment to public safety "plainly constituted speech on a matter of political, social, or other concern." *Id.* at 400 (internal quotation marks omitted). The *Montero* court also concluded that the officer sufficiently pled that he made his remarks as a union vice president and that his remarks did not concern "his ability to properly execute his duties." *Id.* at 398 (quoting *Weintraub*, 593 F.3d at 203). His speech, as pleaded, was thus protected. The court, however, expressly declined to hold that speech engaged in as a union member is categorically speech by a private citizen. *Id.* at 399.

As to whether the plaintiff spoke as an employee, in *Weintraub*, a terminated public-school teacher claimed that school and Board of Education officials retaliated against him after he filed a complaint and a formal grievance for the school officials' refusal to discipline a student who hurled a book at him during class. 593 F.3d at 198. The Circuit affirmed partial summary judgment in favor of the defendants, holding that the teacher spoke pursuant to his job duties because his speech took the form of a union grievance—an internal communication established

by the employer for employee dispute resolutions—and there is no relevant citizen analogue to this form of speech. *Id.* at 203–04. The plaintiff, moreover, "never communicated with the public about the book-throwing incidents and the school administration's subsequent refusal to discipline the particular student." *Id.* at 205. In so holding, the Circuit explained that "speech can be 'pursuant' to a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer"; rather, speech can be "'pursuant to' [an employee's] official duties because it was 'part-and-parcel of his concerns' about his ability to 'properly execute his duties.'" *Id.* at 203 (quoting *Williams v. Dallas Independent Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007)).

Defendants argue that (1) Rugen's speech was neither made as a citizen nor made on a matter of public concern, Dkt. No. 63 at 10–14; and (2) Bonilla, Nunez, Pfeiffer, and Local 2507's speech was not in regard to a matter of public concern, *id.* at 14–16. It is undisputed that Plaintiffs engaged in the following speech.

### 1.   Rugen

Rugen spoke in an interview with ABC News on March 31, 2020. Dkt. No. 51-4. In it, he described the situation facing EMS workers as "madness," explained that his station was running low on gloves and N95 masks and that others did not have any masks left, that he had an underlying health condition that made him more susceptible to harm from COVID, and that he decided to stop seeing his son to prevent his son from possibly catching the virus. *Id.* On April 10 and 11, 2020, Rugen—while not on duty—took the Aus. BC media crew for a ride-along following Pfeiffer and her partner, and in connection with the Aus. BC news video, there are two still photos of Rugen sitting in a vehicle outside of the residential building from which a patient was removed. Dkt. No. 71 ¶¶ 17, 18, 61; Dkt. No. 72 ¶ 16. The article published by Aus. BC on April 21, 2020, describes the ride-along on which Rugen took the media crew and quotes

statements he made during the ride-along.  Dkt. No. 56-3 at 20–23.  In the article, Rugen

describes the pressure and frustration he and his colleagues are experiencing, *see id.* at 22–23,

and is quoted as saying "[w]e're very scared.  We're scared for ourselves, because even through

we're healthcare professionals, we have members who have underlying medical conditions."

Dkt. No. 56-3 at 10.  He is also quoted saying "It's sad, the virus has no discrimination against

anybody.  It's attacking kids.  Eighteen to 104 years old, it's getting them.  It doesn't

discriminate, it doesn't care.  This is craziness out here."  *Id.* at 22.

      Though the parties do not brief the question whether Rugen's conduct in transporting the

Aus. BC media crew to facilitating a story on the effect of the pandemic on first responders

constituted expressive conduct, they appear to agree that it does.  Indeed, the parties' arguments

assume that Rugen's speech included not only the comments he made to the Aus. BC media

crew and the comments he made in an interview with ABC News on or about March 31, 2020

but also the actions he took in transporting the Aus. BC media crew on April 10 and 11, 2022, so

that they could document EMTs at work.  *See* Dkt. No. 63 at 10–11 (Defendants arguing that

Rugen's speech was made in connection with Local 2507's publicity campaign to attract

attention to the working conditions faced by EMS and that "[c]onsequently, he transported a

media crew around following actively working EMS so that the working conditions could be

documented" and spoke to the press about the conditions); Dkt. No. 64 at 18 (arguing that

"Rugen was not acting in furtherance of his core duties when, on his day off, he drove the Aus.

BC reporters around the City following ambulances to document effects of the pandemic on

EMS employees").  "It is well established that '[t]he First Amendment affords protection to

symbolic or expressive conduct as well as to actual speech.'"  *Church of the Am. Knights of the*

*Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) (quoting *Virginia v. Black*, 538 U.S.

343, 358 (2003)).  "In determining whether particular conduct is sufficiently expressive to

implicate the First Amendment, therefore, the test is whether '[a]n intent to convey a

particularized message was present, and [whether] the likelihood was great that the message

would be understood by those who viewed it.'"  *Id.* (quoting *Texas v. Johnson*, 491 U.S. 397, 44

(1989)).  For conduct to be "'sufficiently imbued with the elements of communication to fall

within the scope of the First . . . Amendment,' an activity need not necessarily embody 'a

narrow, succinctly articulable message.'"  *Zalewska v. Cnty. of Sullivan*, 316 F.3d 314, 319 (2d

Cir. 2003) (quoting *Johnson*, 491 U.S. at 404).  In light of the parties' agreement, the Court will

analyze Rugen's First Amendment claim as including his conduct in driving the Aus. BC media

crew around New York City.

Defendants argue that Rugen's speech was made pursuant to Local 2507's publicity

campaign, which they say was meant "to attract media attention to *the working conditions* of

EMS members," Dkt. No. 63 at 10, and was therefore not a matter of public concern.  They cite

cases for the proposition that "where the speech or conduct at issue is intended to redress

personal grievances, such as an employee's dissatisfaction with working conditions or salary,

such speech or conduct does not address matters of public concern and is, therefore, not

protected," *id.* at 11, and argue that Rugen's March 31, 2020 interview is such speech because it

"specifically addresses the long hours EMS members were working," *id.*, and "was clearly

intended to . . . address personal grievances—i.e. wage disputes," *id.* at 12.  They also argue that

Rugen's speech was made pursuant to his official duties because it concerns the number of hours

he worked, the type of work he does, the equipment needed to perform his work, and the wages

he is paid to perform his work; it is "clearly 'part-and-parcel' of his official duties," *id.* at 13, and

because he was sharing information that "could only be learned through his job," *id.* at 14, and was "engaging in speech in and about the workplace," *id.*

Plaintiffs disagree.  They point to the actual content of the statements made by Rugen to the media, not just his purported motivation in taking Aus. BC on the ride-along.  Plaintiffs argue that Rugen's statements about the mental toll that first responders are facing due to the pandemic and the effect that COVID has on civilians of nearly all ages are "plainly newsworthy, and touch on matters that the public was greatly concerned about in April 2020."  Dkt. No. 64 at 16.  They also contend that Rugen was not acting pursuant to his job responsibilities or in furtherance of his core duties when he, while off duty, drove reporters around New York City "following ambulances to document effects of the pandemic on EMS employees" and that he was therefore speaking as a private citizen.  *Id.* at 18.  They also point out that Rugen's speech had an "obvious civilian analogue" in statements to the press and argue that this further supports a determination that Rugen was speaking as a private citizen at the relevant times.  *Id.* at 19.

The thrust of Defendants' argument appears to be that because Plaintiffs were discussing matters related to the conditions of their employment—such as the number of hours they were working during COVID, the lack of PPE they had during the early stages of the pandemic, and the low pay first responders were receiving while performing emotionally and physically draining work—and were doing so as part of Local 2507's publicity campaign, Plaintiffs could not also be discussing content that touches on a matter of public concern.  This argument fails for several reasons.

First, even if Rugen were motivated to speak by a personal employment grievance, "it does not follow that [he] cannot be speaking on a matter of public concern."  *Sousa*, 578 F.3d at 174.  As explained *supra*, "[a] speaker's motive is not dispositive in determining whether his or

her speech addresses a matter of public concern," *id.* at 173; a court may conclude that speech

that is "not motivated by a desire to address a matter of public concern" may "nevertheless"

address what a court believes is "inherently a matter of public concern," *id.* at 171 (citing

*Reuland*, 460 F.3d at 418); *see also Golodner v. Berliner*, 770 F.3d 196, 203 (2d Cir. 2014)

("[A]n individual motivated by a personal grievance can simultaneously speak on a matter

affecting the public at large."); *Nagle v. Marron*, 663 F.3d 100, 107 (2d Cir. 2011) (holding that

"the district court erred in its conclusion that because [plaintiff's] speech . . . was not focused on

the public welfare but was instead advancing some personal agenda, that speech was necessarily

not protected" (alterations adopted) (internal quotation marks and citation omitted)).[3]

Second, "[w]hether an employee's speech addresses a matter of public concern must be

determined by the content, form, and context of a given statement, as revealed by the whole

record." *Connick*, 461 U.S. at 147. "Speech deals with matters of public concern when it can be

fairly considered as relating to matters of political, social, or general interest to the community or

value and concern to the public." *Specht*, 15 F.4th at 600. "[D]iscussion regarding current

government policies and activities is 'perhaps the paradigmatic "matter[] of public concern.""'"

*Harman v. City of New York*, 140 F.3d 111, 118 (2d Cir. 1998) (quoting *Sanjour v. EPA*, 56 F.3d

85, 91 (D.C. Cir. 1995) (en banc)).

Rugen's speech was of public concern. Although it mentioned and was based on his

personal experience, it also spoke more broadly to the situation facing EMS workers generally

and to the access those workers had to personally protective equipment. Those concerns, which

---

[3] It is also notable that, for all of Defendants' discussion about the motivation of Local 2507's publicity campaign to address pay disparity, it does not point to any statements by Plaintiffs to the media that speak about the pay disparity, instead referencing deposition testimony about the "main objection [sic] of the campaign." Dkt. No. 63 at 12 (quoting Dkt. No. 59-1 at 177).

related to the impact that the COVID-19 pandemic was having upon the populace and on the personnel charged with protecting the public in March and April 2020, was of great "interest to the community," "value and concern to the public," *id.*, and of "public importance," *Specht* 15 F.4th at 601.  The content and context of Plaintiffs' speech touches right at the heart of difficulties—both in terms of logistical and emotional capacity—faced by public services in response to the COVID-19 surge in New York City at the height of the pandemic in early 2020.

Rugen's speech was not of public concern simply because EMS members sought better working conditions.  It was of public concern because of what it conveyed about the challenges to their ability, and therefore likewise the ability of all others similarly situated, to adequately respond to COVID's rapid spread in New York City.  Rugen's statements about the protective equipment EMS members had, the hours they worked, their emotional state, and the potential for them to get sick and be taken out of the workforce at a time that emergency calls were dramatically increased spoke not just to his personal experience or even just to the personal experience of EMTs employed by FDNY; it also spoke to the challenges faced by all emergency workers at a time when there was insufficient protective equipment, when the fears and reality of what the pandemic could do to the population were rampant, and when extraordinary strains were being put on the public health system.  In this regard, communications between Plaintiffs and the press "implicate[d] matters of public importance" related to the government's handling of the COVID pandemic response and "relate[d] to possible governmental malfeasance, public safety, as well as to the public fisc."  *Specht*, 15 F.4th at 601–02; *see also Jackler*, 658 F.3d at 237 (recognizing that misconduct within police departments, another public-facing city agency, is "plainly a matter of public concern").

Indeed, in the early days of the pandemic, when little was known about COVID, non-essential businesses were closed, and individuals were advised that they should stay home, the stories of front-line workers were providing vital sources of information about how COVID could manifest, who it affected, and how widely and quickly it was spreading.  For example, Rugen's comment that "the virus has no discrimination against anybody.  It's attacking kids.  Eighteen to 104 years old, it's getting them," Dkt. No. 56-3 at 22, provides data about how who may be at risk of getting sick with COVID.  Moreover, that the statements were made to press—and press across various outlets, local, national and international—supports that the issues Plaintiffs were speaking about were "of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication."  *City of San Diego v. Roe*, 543 U.S. 77, 84 (2004).

Statements about conditions of employment are not automatically immunized from being statements touching on matters of public concern.  To be sure, the Second Circuit has suggested that "'circumstances and prerequisites of [an individual's] employment'" and allegations of "'adverse career, financial and emotional effects [the plaintiff] suffered personally'" "inherently constitute[] 'personal grievances' that do "not rise to the level of public concern."  *Golodner*, 770 F.3d at 204 (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008)).[4]  And it has observed that its "discussion of what constitutes 'speech on a purely private matter' has

[4] The Court observes that the Circuit in *Ruotolo* applied the principle that "[t]he heart of the [public-concern] matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'"  514 F.3d at 189 (quoting *Lewis*, 165 F.3d at 163–64).  Because the *Ruotolo* court concluded that the "lawsuit sought to redress his personal grievances," it also concluded that the plaintiff's "lawsuit did not constitute speech on a matter of public concern."  *Id.*  The formulation that the *Ruotolo* court applied, which suggested that a speaker's motive is dispositive in considering whether speech at issue addresses a matter of public concern, has since been expressly disavowed by the Circuit, casting doubt on the propriety of relying on the *Ruotolo* court's statement.  *See Sousa*, 578 F.3d at 173.

always been closely tethered to an individual employee's conditions of employment." *Golodner*, 770 F.3d at 204 (quoting *Lewis v. Cowen*, 165 F.3d 154, 164 (2d Cir. 1999)).  But courts are to examine not just the content of speech, but also its "form" and its "context," and the Circuit has never adopted such a broad proposition as Defendants would have the Court adopt here that, simply because speech is about an employee's work conditions, it also cannot be about a matter touching public concern.  Indeed, the Circuit has made clear that complaints about conditions of employment may constitute a matter of public concern where, for example, the root of the grievance is a matter of public concern and the problem complained of is general and affects more than just the individual plaintiff.  *See e.g.*, *Cotalero*, 460 F.3d at 252.

In *Cotalero*, the Circuit concluded that complaints made in letters and lawsuits regarding discrimination in the workplace directed at plaintiff and other Spanish-speaking employees constituted protected speech, noting that "discrimination in a government workplace is a matter of public concern" and that "[b]oth the letter and the complaints in the lawsuits concern discrimination problems generally and were not limited to instances affecting only [plaintiff]." *Id.*  Here, too, the statements Plaintiffs made about the conditions faced by EMS workers during the pandemic "were not limited to instances affecting only [Plaintiffs]." *Id.*  Rugen's statements concerned the effect that the pandemic was having on EMS members City-wide.  He stated: "We're very scared.  We're scared for ourselves, because even through we're healthcare professionals, we have members who have underlying medical conditions."  Dkt. No. 56-3 at 10. He talked about how EMS members were running short of supplies, referencing the situation at his own station as well as at other stations around the city.  Dkt. No. 51-4.  His statements about his own personal health situation and his inability to see his son concerned the risks that COVID could pose to Rugen individually and to his son.  *Id.*  Rugen's statements were not made by "[a]n

employee [complaining] solely about his own dissatisfaction with the conditions of his own employment," *Sousa* 578 F.3d at 174, nor was Rugen speaking about employment issues that were "personal in nature" or "related to [their] own situation," *Jackler*, 658 F.3d at 236 (internal quotation marks and citation omitted); he was thus not "speaking 'upon matters only of personal interest,'" *Sousa* 578 F.3d at 174 (quoting *Connick*, 461 U.S. at 147); *cf. Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999) ("We believe that activities on behalf of a union faction that necessarily entail a substantial criticism of management raise matters of public concern under *Connick*.")

It is particularly so that statements regarding a plaintiff's employment can also constitute statements on a matter of public concern where the public health and welfare are implicated in the subject of the speech.  In *Montero*, for example, the Circuit held that a Yonkers police officer sufficiently plead that he spoke as a citizen on a matter of public concern in criticizing a supervisor's decision to discontinue police units.  890 F.3d at 386.  In so holding, the Circuit explained that "speech about the termination of the police units—which [plaintiff] allegedly stated would endanger public safety—plainly constituted speech on a matter 'of political, social, or other concern' to the Yonkers community" notwithstanding the possibility that the plaintiff was motivated by a personal grievance to speak.  *Id.*  In *Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999), the Circuit explained that comments of police department members "which included speech on crime rates, police staffing, equipment shortages and related budgetary matters quite plainly involve matters of public concern."  And in a case strikingly similar to the one here, a former volunteer firefighter who worked at Ground Zero and was placed on restricted duty and ultimately dropped from the roster after his comments about the illnesses of first responders at Ground Zero were widely publicized was found to be speaking on a matter of public concern.

*Forras v. Andros*, 470 F. Supp. 2d 283, 287 (S.D.N.Y. 2005).  In denying the defendants' motion for summary judgment on the plaintiff's First Amendment retaliation claim, the court explained that the:

> [p]laintiff has sufficiently established that his comments about the impact of working at Ground Zero in the wake of the September 11th attacks were a matter of public concern.  He has spoken about the illnesses suffered by "hundreds of first responders," the lack of proper equipment at Ground Zero, and other prominent issues surrounding the terrorist attack.  His comments reflect a broad public purpose and do not merely redress personal grievances.

*Id.* at 290.

In light of the above, the Court concludes that Rugen was speaking about matters of public concern when he made statements about and facilitated the documentation of the working conditions of EMS members generally and when he made statements about his own experience providing critical care during an unprecedented pandemic.

The Court also concludes that Rugen spoke as a "citizen, rather than pursuant to [his] job requirements." *Specht*, 15 F.4th at 602.  The question whether an individual spoke as a private citizen entails "two relevant [but not dispositive] inquiries: (1) whether 'the speech fall[s] outside of the employee's official responsibilities,' and (2) whether 'a civilian analogue exist[s].'"  *Id.* at 603 (quoting *Matthews*, 779 F.3d at 173).  Rugen was not acting pursuant to his official duties when he transported the Aus. BC media crew on a ride-along, made the comments that were quoted in the Aus. BC news article, or made the comments that were quoted in the March 31, 2020 article.  "The 'critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.'"  *Montero*, 890 F.3d at 398 (quoting *Lane*, 573 U.S. at 240).  Nor does "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment . . . transform that speech into employee—rather than citizen—speech." *Lane*, 573 U.S. at 240.  The

Second Circuit has held, for example, that a union officer whose speech touched on matters he learned about in the course of his employment as a police officer spoke as a private citizen when "his union speech was not composed of statements made as a 'means to fulfill' or 'undertaken in the course of performing' his responsibilities as a police officer." *Montero*, 890 F.3d at 399 (quoting *Weintraub*, 593 F.3d at 203).

Rugen's speech cannot reasonably be considered to have been "undertaken in the course of performing" his responsibilities as an EMT. *Weintraub*, 593 F.3d at 203. In their brief, Defendants cite Rugen's description of his job responsibilities as "to go out a lot" and provide "patient care, monitor [the] department radio . . . , transport sick and injured residents of the City of New York and visitors of the City of New York, and everything in between." Dkt. No. 59-2 at 10; *see also* Dkt. No. 63 at 13. While some of Rugen's statements do concern these duties insofar as they discuss the types of patients falling ill with COVID, that evidence does not establish that the making of statements was "ordinarily within the scope" of his duties. *Lane*, 573 U.S. at 240. There is no evidence that describing the intricacies and the difficulties of providing patient care "would be a normal part of [the] professional activities" of any of Plaintiffs, including Rugen. *Specht*, 15 F.4th at 604. There also is evidence to support that Rugen's speech did not "owe its existence to [his] professional responsibilities." *Garcetti*, 547 U.S. at 421–22 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen."). Rugen's speech to the press about long hours, equipment, and types of patient care falls outside of his official responsibility to provide patient care, and it was therefore made in his capacity as a private citizen.

The conclusion that Rugen was speaking as a private citizen is supported by the means by which he made his speech, i.e., its form—speaking to the media.  While the question whether an employee's speech has a civilian analogue is not dispositive, it is relevant to the inquiry of whether the speech was made by a private citizen.  *Weintraub*, 493 F.3d at 204.  There is a civilian analogue to speech if the "same or similar channel [for a communication] exists for the ordinary citizen."  *Matthews*, 779 F.3d at 176.  Here, individuals can give interviews to news crews just as they can follow ambulances around the City and video record those encounters. Defendants do not appear to contest this.

Because Rugen was not acting pursuant to his official duties when he made comments to the press or brought the Aus. BC media team on a ride-along, and because he was speaking on matters of public concern on these occasions, his speech is entitled to protection from First Amendment retaliation.

### 2.    Nunez, Pfeiffer, and Bonilla

Nunez and Pfeiffer were featured in the Aus. BC news video that was filmed on April 10 and 11, 2020.  Dkt. No. 71 ¶ 8.  The video depicts Nunez and Pfeiffer performing patient care; stills in the news article accompanying the video shows this as well.  *Id.* ¶ 9.  Both Nunez and Pfeiffer are quoted in the article, *see* Dkt. No. 56-3; prior to appearing in the video and speaking to the media, neither Nunez nor Pfeiffer informed the FDNY they were going to do so, Dkt. No. 71 ¶ 20.  Nunez agreed to be interviewed by Aus. BC at the request of Rugen, *id.* ¶ 30, and Pfeiffer participated in the press videos and articles at the request of Barzilay, Local 2507's President, *id.* ¶ 29. During the Aus. BC visit, but not while they were working, Pfeiffer and Nunez spoke to the Aus. BC team about the difficulties they faced working as paramedics during the pandemic.  Dkt. No. 72 ¶¶ 20, 22, 23.

Nunez is quoted in the article accompanying the Aus. BC news video, stating that he and his colleagues did everything they could to prevent a patient's death.  Dkt. No. 71 ¶¶ 18–19; Dkt. No. 56-3 at 28.  He also explains that the FDNY paramedics try to educate patients about staying in their homes rather than risking further exposure by going to the hospital.  Dkt. No. 56-3 at 29. The video accompanying the article shows Nunez on a cell phone, and overlay text on the video says that "Nunez is on the phone to a doctor for medical advice, as his colleagues administer CPR," Dkt. No. 56-3 at 26, though Plaintiffs point out that this is just the reporter's interpretation of the conversation, Dkt. No. 71 ¶ 14.  Nunez submitted a declaration explaining that he "spoke to the [Aus. BC] film crew about the difficulties [he] faced working as a Paramedic during the pandemic."  Dkt. No. 54 at 2.

Pfeiffer was also quoted in the article.  The overlay text on the video quotes Pfeiffer as saying "It's oxygen, relax," to a patient receiving oxygen, Dkt. No. 56-3 at 14, and the text of the article itself has Pfeiffer describing the low oxygen values seen in COVID patients, *id.* at 18, and the symptoms described by suspected COVID patients, *id.* at 19–20.  Pfeiffer is also quoted in the article as saying that she has been experiencing "lots of ups and downs, anxiety attacks, hysterical crying" and that, if she found out she was responsible for passing the virus along to a loved one, "[she] couldn't live with [her]self."  *Id.* at 20.  The article concludes with a quote from Pfeiffer, expressing her fears about the effect that COVID will have on first responders: "I think it hasn't really hit.  I'm sure once things settle down it's going to hit a lot harder."  *Id.* at 31.

On April 15, 2020, an AP film crew followed an FDNY ambulance staffed by Bonilla and her work partner.  Dkt. No. 72 ¶ 26.  Bonilla spoke to AP reporters prior to the start of her shift and again during her shift, during which she was filmed on a sidewalk outside of a patient's

home and expressed distress about a patient she had tried to save.  *Id.* ¶ 27.  The AP published a

video of the encounter.  *Id.* ¶ 28.  Much of the footage in the AP video also appears in videos that

appeared on MSN and Fox 5 New York.  *See* Dkt. No. 59-44 (Def. Video 5); *id.* ¶¶ 23–26.

Bonilla participated in the press videos at the request of Barzilay.  Dkt. No. 71 ¶ 29.

In the videos, Bonilla appears in uniform near an FDNY ambulance.  *Id.* ¶ 24; *see also*

Dkt. No. 53-1 (available at www.aparchive.com/metadata/youtube/

a3f445b770c840b0a7a7d8d2a6e1d5d2).  In the AP video, Bonilla discusses the pandemic

generally, preparations for going in to tend to a patient, and her reaction to the fate of a patient:

- "I don't think that anyone was prepared for this because there's so many more deaths out there and so many more sick people that are suffering, the suffering has increased."
- "The calls that we receive, most of them are corona positive, and most of them are suspected COVID positive."
- "It's just not a regular stomach ache or arm pain or back pain, it's actual real life sicknesses."
- "Could be COVID related, so now we gotta gown up.  I'm gonna gown up in the back of the ambulance."
- "All jobs there's an adrenaline, so I'm just drained right now.  I'm emotionally drained and physically drained and definitely mentally drained, you know?"
- "Since this happened, I haven't been able to sleep with the lights off.  I sleep with my lights on.  Things like this replay in my head, you know, you hear the cries, you hear the um, you just hear and you see everything all over again."
- "This one is hard, it's so hard.  So young, young kids, youngest boy is three, and you can't do nothing.  This is when you don't try to do it in front of the family and you take a time out to do it on your own.  You try to take the emotion with you so you don't do it in front of the family."
- "I'm always a sucker for this.  I mean, this job takes its toll, but it's something that I love to do because it's reality.  I think me taking care of others is my calling, it has to be."

Dkt. No. 53-1.  Many of these quotes also appear in the video on MSN, Dkt. No. 59-44 (Def.

Video 5), and on the Fox 5 New York video, *see* Dkt. No. 71 ¶ 78; Dkt. No. 72 ¶ 84 (citing

videos available at: https://www.fox5ny.com/news/nyc-paramedic-haunted-by-coronavirus-toll-

you-hear-the-cries and https://www.fox5ny.com/video/675273.amp).  The videos show footage

not only of Bonilla speaking directly to the camera but also of what appears to be Bonilla engaged in her official duties, including putting on PPE in preparation for a patient call, bringing medical equipment into what appears to be patients' homes, and returning medical equipment back to her ambulance.

Bonilla also discussed her work as a paramedic during the pandemic in two other video interviews: one with MSNBC and one with the TV personalities Kelly Ripa and Mark Cosuelos. Dkt. No. 71 ¶ 79. In the MSNBC video, Bonilla discusses the PPE that first responders wear on calls, explaining that in the beginning they did not have enough equipment but now they do, as well as the personal toll that the pandemic was placing on first responders, describing how she was not able to visit or interact with her family members for fear of passing on the virus. Dkt. No. 59-44 (Def. Video 3). In the interview with Kelly Ripa and Mark Consuelos, Bonilla wears an FDNY sweatshirt and talks about her fear of contracting COVID or bringing the virus home to her children and about how patients with suspected COVID present. Dkt. No. 59-44 (Def. Video 4). She also expresses her pain in not being able to see her parents for months and her gratitude for the support New Yorkers were showing first responders during this time. *Id.*

In their brief in support of their motion for summary judgment, Defendants argue that Nunez, Pfeiffer, and Bonilla's speech was not constitutionally protected because each spoke about their personal experiences working during the pandemic and the emotional toll it was taking, and therefore it related to a vindication of a person interest, not public concern. Dkt. No. 63 at 15. Defendants also argue that "to the extent that it could be inferred that in speaking to the press plaintiffs Bonilla, Pfeiffer, and Nunez were attempting to address the wage disparity,

stressful working conditions of the EMS, or the lack of PPE, their First Amendment retaliation claims still fail for the reasons set forth in Point I(B)(i.)."[5]  *Id.* at 15–16.

For much the same reasons as Rugen's speech was on a matter of public concern, so was the speech of Nunez, Pfeiffer, and Bonilla.  They each spoke about the emotional toll that responding to the pandemic was having on their lives.  They discussed the fear they faced about potentially passing on the virus to their loved ones and how that has caused them to adjust their behaviors.  And they spoke about how people were reacting to COVID illnesses and about their views on individuals staying home to "ride [] out" their illnesses instead of going to the hospital with a mild case of COVID.  Dkt. No. 56-3.  The speech addressed the general impact of COVID on emergency workers.  As explained with respect to Rugen, whether their speech was motivated by personal grievances as opposed to a desire to educate the community about a matter of public concern is not dispositive, as "a person who is 'motivated by a personal grievance' can still 'be speaking on a matter of public concern.'"  *Bourne*, 2017 WL 1138125, at *5 (quoting *Sousa*, 578 F.3d at 173–74).

Defendants contest only that Nunez, Pfeiffer, and Bonilla spoke on matters of public concern and do not contest that they spoke as citizens.  However, in the Court's view, it is clear that at least some of the statements in the articles in which these Plaintiffs were quoted were made pursuant to their official duties.  For example, in the Aus. BC article, Pfeiffer is quoted as

---

[5] Defendants' brief does not contain a Point I(B)(i), but the Court understands Defendants to be referring to Point I(B)(1), which includes arguments that Rugen's speech was not a matter of public concern because it was "clearly intended to address personal grievances" like long working hours and wage disputes.  Dkt. No. 63 at 11–12.  The section also includes fact-specific arguments regarding whether Rugen's speech was made pursuant to his official duties—the Court does not understand Defendants' reference to "the reasons set forth in Point I(B)(i.)" to refer to arguments about Nunez, Pfeiffer, and Bonilla were speaking in their capacities as private citizens.

saying "It's oxygen, relax" to a patient while she was treating the patient.  *See* Dkt. No. 56-3 at 14.  Similarly, Bonilla is quoted describing the actions she is taking in response to a suspected COVID case: "Could be COVID related, so now we gotta gown up.  I'm gonna gown up in the back of the ambulance."  Dkt. No. 53-1.  And Nunez, Pfeiffer, and Bonilla are all depicted engaging in their job responsibilities—including entering homes with their equipment in response to calls, providing patient care in an apartment, and putting on PPE to prepare to enter a patient's residence on a call.  These actions and statements, which are "part-and-parcel" of Plaintiffs' job responsibilities, cannot be fairly read to have been made by Pfeiffer, Nunez, or Bonilla in their capacities as citizens and therefore do not constitute protected speech.

      **3.**      **Local 2507**

Defendants argue that "plaintiff Barzilay's speech and the Union's publicity campaign were not matters of public concern in they [sic] were geared solely to redress personal grievances" and that Barzilay and the Union "cannot show that they were subject to any adverse action by defendants because of the union's speech" and their speech was not chilled.  Dkt. No. 63 at 16.  While Defendants frame this in terms of a First Amendment retaliation claim brought by Barzilay and Local 2507, only Local 2507 brings such a claim; Barzilay does not.  *See* Dkt. No. 26 ¶¶ 100–103.  For the same reasons discussed above, the Court rejects Defendants' arguments that the statements made by Local 2507's members were not matters of public concern.  Moreover, Defendants are not entitled to summary judgment on the basis that the Union's speech was not chilled.  Unions speak through their members, and speech is chilled when government action "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."  *Dillon v. Morano*, 497 F.3d 247, 254 (2d Cir. 2007) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006)).  Notwithstanding evidence that some Union speech continued, a reasonable jury could conclude that the speech of

the Union's members would be chilled following the restrictions placed on the individual

Plaintiffs, particularly given evidence that Rugen, Pfeiffer, Nunez, and Bonilla stopped speaking

with the press following their restrictions.  Dkt. No. 66 ¶ 10 ("None of the Plaintiffs in this case

have spoken with the press since the date they were restricted by FDNY.").

*      *      *

Except for the statements and activity of Nunez, Pfeiffer, and Bonilla identified above

that was made in their capacities as paramedics, Plaintiffs' speech is entitled to protection from

retaliation.  Defendants raise two defenses to Plaintiffs' retaliation claim: first, that they would

have taken the same employment actions even if Plaintiffs had not engaged in protected speech;

and second, that Plaintiffs' speech was likely to disrupt government activities, and the harm of

this disruption outweighs the value of Plaintiffs' speech.  Though these defenses are distinct and

require individual analyses, both Defendants' and Plaintiffs' arguments with respect to each are

intertwined.  The Court will analyze each defense in turn, taking into account the relevant

arguments and facts, overlapping through they may be.

### B.    Whether Defendants Would Have Taken the Same Adverse Action in Any Event

Defendants argue that, even if Plaintiffs engaged in protected speech, Defendants are

entitled to summary judgment because "the evidence establishes that" they would have taken the

same adverse action even in the absence of protected speech.  Dkt. No. 63 at 17.  "If a plaintiff

makes a sufficient showing of each of [the First Amendment Retaliation] elements, summary

judgment is not appropriate unless the defendant establishes as a matter of law that he would

have taken the same adverse employment action even absent the protected conduct."  *Dillon,* 497

F.3d at 251; *see Cotarelo*, 460 F.3d at 251–52 ("[T]he defendant can still prevail on a motion for

summary judgment if it can show that it would have taken the same adverse employment action

49

even in the absence of protected conduct." (internal quotation marks omitted) (quoting *Blum*, 18 F.3d at 1010)).  A defendant must make this showing by a preponderance of the evidence.  *Mt. Healthy*, 429 U.S. at 287 (holding that employers must demonstrate by a preponderance of the evidence standard that they would take the same action in the absence of protected conduct to defeat employees' First Amendment claims).

The *Mt. Healthy* defense, invoked by Defendants, "establishes a defense available to employers who have been found to have acted on an impermissible motive."  *Dibble v. Fenimore*, 545 F.3d 208, 218 (2d Cir. 2008).  In other words, the *Mt. Healthy* defense is available in so-called "dual motivation cases" where the employer does not dispute that there is evidence of an impermissible reason for the adverse employment action but "the basis for the adverse action is not either the improper or the proper reason, but both reasons."  *Brock v. Casey Truck Sales, Inc.*, 839 F.2d 872, 877 (2d Cir. 1988); *see also id.* at 877–78 ("To proceed correctly, the fact-finder who concludes a case by applying *Mt. Healthy* will have already found, either explicitly or implicitly, that the plaintiff has sustained his burden of proving the existence of an improper reason for the adverse action."); *cf. Holo-Krome Co. v. N.L.R.B.*, 954 F.2d 108, 110 (2d Cir. 1992).[6]

---

[6] "Dual motivation" cases are distinct from "pretext" cases.  "In a pretext case, the employer defends on the ground that he acted, not for the alleged invalid reason, but instead for a valid reason."  *Holo-Krome Co.*, 954 F.2d at 110.  "In a dual motivation case, the employer defends on the ground that, even if an invalid reason might have played some part in his motivation, he *would have* taken the same adverse action in the absence of the invalid reason, *i.e.*, he would have taken the action on the basis solely of some valid reason."  *Id.*  "[P]retext analysis determines what the true motivation actually was; dual motivation analysis determines what the employer's conduct would have been if the improper motivation had not been present."  *Id.*; *see Weinstein*, 676 F. App'x at 45 (assuming, for the sake of analysis, that a jury could have cast doubt on the legitimacy of a proffered reason that was claimed to be pretextual but prefacing analysis with "[e]ven if a 'pretext' inquiry were appropriate here") (citing *Holo-Krome Co.*, 954 F.2d at 110); *Deep v. Coin*, 453 F. App'x 49, 55 (2d Cir. 2011) (summary order) (explaining that the Second Circuit "ha[s] never identified pretext as a relevant factor in considering a First

In considering whether a defendant is entitled to summary judgment on the basis of the *Mt. Healthy* defense, "[t]he operative question is whether defendants have demonstrated that a reasonable jury *would have to find* by a preponderance of the evidence that" the defendants would have taken the adverse action against the plaintiff "absent his citizen-media speech." *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 122 (2d Cir. 2015) (emphasis added).  Put one way, "[t]he unprotected conduct, standing alone, must justify the adverse actions." *Id.*  It is not sufficient simply that unprotected misconduct occurred, as "defendants asserting a *Mt. Healthy* defense may not rely solely on the occurrence of unprotected misconduct: they must also articulate and substantiate a reasonable link between that misconduct and their *specific* adverse actions.  A general statement that the employer would have taken *some* adverse action will not suffice." *Id.* at 123.  Expressed more precisely, the availability of the *Mt. Healthy* defense turns upon whether "the defendant would have taken the same adverse action even if the *impermissible reason* had not existed," rather than even if the protected speech had not existed.  *Weinstein v. Univ. of Connecticut*, 676 F. App'x 42, 45 (2d Cir. 2017) (summary order) (emphasis added) (citing *Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Wash. Indus. Dev. Agency*, 77 F.3d 26, 32 (2d Cir. 1996)).  That is, "although the language in *Mt. Healthy* refers to the plaintiff's *conduct*, the Court's analysis, properly understood, attempts to weigh the impact of the

---

Amendment retaliation claim under *Mt. Healthy*").  At the same time, however, it is open to the plaintiff in a case charging retaliation in violation of the First Amendment to show that the asserted non-discriminatory reason would not have led to the adverse employment action and that it is being offered only as a post-hoc justification for action that would not have been taken but for the First Amendment protected activity.  In that sense, the plaintiff can show that the defendant's "justifications for its actions were merely pretext for retaliation in response to . . . protected conduct." *Zehner v. Jordan-Elbridge Bd. of Educ.*, 666 F. App'x 29, 32 (2d Cir. 2016) (summary order).

defendant's *impermissible reason* on the defendant's decision to act." *Greenwich Citizens Comm.*, 77 F.2d at 32.

The defense is available even "when the plaintiff's protected conduct is a unitary event that could prompt either a permissible or impermissible reason on the part of the defendant to act." *Id.* at 33. When the adverse action is based on a unitary event rather than on two or more instances of conduct each of which could have justified the adverse actions, "claims of alleged retaliation for the exercise of a constitutional or statutory right require focusing precisely on whether the defendant acted for an impermissible reason, and not merely in response to the plaintiff's conduct." *Id.* In particular, such a "unitary event" may occur, for example, when a defendant argues that that a plaintiff was not terminated for the content of his protected speech "but the way and manner in which it was spoken" in violation of an employer policy. *See Pisano v. Mancone*, 2011 WL 1097554, at *9 (S.D.N.Y. Mar. 18, 2011); *cf. Nagle*, 663 F.3d at 108 (explaining that "[a]n employee's failure to follow protocols may give rise to an alternative, non-retaliatory ground for an adverse employment action" but that First Amendment protection of speech is not "conditioned . . . on an adherence to employer protocols").

If, viewing the evidence in the light most favorable to Plaintiffs and taking all reasonable inferences in their favor, reasonable jurors could differ as to whether Defendants would have taken the same adverse employment actions in the absence of Plaintiffs' protected speech, then summary judgment must be denied and the question whether Defendants' actions rested on permissible grounds must be left to the jury. *See, e.g.*, *Zehner*, 666 F. App'x at 32.

In support of their argument that Plaintiffs would have been placed on restricted duty and/or suspended even absent their protected speech, Defendants contend that the adverse employment actions taken against all the individual Plaintiffs were a result of the FDNY's need

to determine if there was a breach of patient confidentiality or violations of HIPAA and to prevent further breaches.  Defendants explain that, "[a]t the time plaintiffs were interacting with the media, FDNY had no prior knowledge that they were going to interact with the press or that the media articles and video would depict and/or mention patient information" and that "[t]he FDNY was also not in receipt of any information indicating that patients had authorized the disclosure of their personal information."  Dkt. No. 63 at 18.  As to Rugen specifically, Defendants argue that his suspension was due to his perceived violation of HIPAA and the belief that he was abusing his position by transporting the media to field locations and providing them unauthorized access to patient information and permission to film them performing patient care without patient authorization.  Defendants cite, among other things, testimony by Brown that "duty restrictions are commonly utilized when there are allegations of serious misconduct and further investigation is warranted," *id.* at 17; evidence that other EMTs who had not engaged in speech had adverse action taken against them pending investigation of potential misconduct, *id.*; evidence of multiple investigations into the question whether Plaintiffs' actions breached HIPAA, underscoring the severity of the potential violations, *id.* at 18; and evidence that the restrictions were lifted as soon as the FDNY was informed that there had been no criminal violation of HIPAA, *id.* at 19.

Plaintiffs argue that Defendants' reasons for restricting Plaintiffs' employment are pretextual and that Defendants would not have taken the actions they took but for the content of Plaintiffs' protected speech.  They point to the difference in treatment between Plaintiffs, who were quoted in the press, and others on duty who were shown in the articles and video but who were not subject to discipline, as well as the difference in treatment between Plaintiffs and employees who were featured in articles pursuant to press interactions arranged by the FDNY

and who also were not disciplined. *Id.* at 29. They also contend that Defendants' unreasonable actions taken after Plaintiffs were restricted is additional evidence of pretext, including continuing Plaintiffs in restricted status even after the FDNY obtained patient releases that the film-crew reporter had obtained. *Id.* at 29–30.

The FDNY officers responsible for the adverse actions testified that they based those decisions at the time on concerns regarding Plaintiffs' conduct and not on the content of their speech. Assistant Commissioner Velez, who is responsible for the management of the FDNY's BITS, made the decision to restrict the employment of plaintiffs Nunez, Pfeiffer, and Bonilla on April 26, 2020. *See* Dkt. No. 72 ¶¶ 30, 34, 38, 41; *see also* Dkt. Nos. 59-23; 59-25; 59-28. He testified the reason for the restrictions was "the apparent violation of Department Rules and Regulations," including what he referred to as the "Public Speaking in Press Policy" the "General Rules of Misconduct," and "apparent . . . HIPAA Violations." Dkt. No. 59-6 at 21–22. He further testified that the conduct that gave rise to the restriction was related to "an article in the press that contained articles [sic] and videos." *Id.* at 22. Velez also testified that he was the decisionmaker with respect to Rugen's suspension and restriction, Dkt. No. 59-6 at 17, which also was announced on April 26, 2020. Dkt. No. 59-30. The letter informing Rugen of this suspension and restriction was signed by Joseph T. Palazzolo II ("Palazzolo"), the Deputy Director of BITS, and was on letterhead indicating that it came from "Carlos Velez Assistant Commissioner Bureau of Investigations and Trials." *Id.* It read "[t]his suspension is based on your violation of the FDNY's Social Media and HIPAA Privacy Policies, New York State Public Health Law and Federal Patient Privacy Law/Regulations on or about April 10, 2020." *Id.*

There is other conduct that supports that Velez's decision was based on Plaintiffs' conduct. By emails dated April 20, 2020 and April 22, 2020, FDNY's BITS personnel referred

the matters involving Rugen, Nunez, Pfeiffer, and Bonilla to the DOI for investigation and said they were doing so based on potential and alleged HIPAA violations.  Dkt. Nos. 59-21 (Bonilla); 59-22 (Rugen, Nunez, and Pfeiffer).  The email referral for Bonilla explained that she "allowed a news crew to follow her during a tour and she discussed and allowed filming during patient care. This was not authorized or discussed with FDNY's Legal or Public Information and potentially involves multiple members and/or officers."  Dkt. No. 59-21. The email included links to the news articles and attached timesheets showing that Bonilla worked on the relevant date, timesheets for Station 3 supervisors that worked that day, the jobs Bonilla responded to in her tour, and a draft copy of Station 3 April 2020 schedule for all members.  *Id.*  It also notes that "Station 3 video is being preserved to see if other members were aware or present during filming."  *Id.*  The email referral to DOI involving Rugen, Nunez, and Pfeiffer stated that it was "in relation to the [Aus. BC] article containing videos and photos."  Dkt. No. 59-22.  It explains that "[t]he article states this unauthorized ride along happened on Good Friday (4/10), but it's possible events occurred over multiple dates and tours[] and involve multiple members, not all yet identified."  *Id.*  It links to the article and provides a list of the information apparently contained therein, including potentially identifiable information and "[m]embers present" including Rugen, Nunez, and Pfeiffer, as well as Pfeiffer's partners and Nunez's partner— neither of whom are identified by name.  *Id.*  It also states that it is attaching time records for the three members named in the article.  *Id.*  Palazzolo testified that he played a role in deciding referrals should be made to the DOI and that he decided they should be "because of the potential for HIPAA violations in the conduct that [he] had seen."  Dkt. No. 59-7 at 31; *see also id.* at 28. And once the DOI notified the Velez that they would not be investigating the matter, the restrictions on Nunez, Pfeiffer, and Bonilla were lifted.  Dkt. No. 71 ¶ 102.

There is evidence in the record that FDNY personnel continued to believe that Plaintiffs may had violated HIPAA even after receiving the letter from Local 2507's counsel, suggesting that investigating the potential HIPAA violation was their true motive for taking the actions that they did.  First, in response to the letter, Brown wrote that Rugen, Nunez, Pfeiffer, and Bonilla, are "currently under Fire Department investigation based upon allegations of serious misconduct" and that the measures taken "are precautionary measures" and "are not new or onerous, but are commonly utilized by city agencies depending on the severity of the allegations."  Dkt. No. 59-33.  Indeed, there is other evidence that taking adverse action prior to a determination of whether disciplinary charges should be issued is common practice.  *See* Dkt. No. 52 ¶ 11.  Second, there is evidence that FDNY continued to investigate whether the individuals encountered by Pfeiffer, Nunez, and their partners on the dates in question had, in fact, given permission to the Aus. BC media crew to be filmed after receiving the letter and after receiving authorizations that the Aus. BC reporters had received from residences where the reporters had filmed.  *See* Dkt. No. 59-34 (investigation notes from June 3, 2020).

There is evidence that could cut in the other direction, however.  Plaintiffs immediately disputed the basis for the adverse actions and provided information that would suggest no HIPAA violation occurred.  On April 27, 2020, Local 2507's attorneys wrote to Brown, explaining that, while the FDNY had not yet disclosed the specific grounds on which the disciplinary action was taken, the assumption was "that the Department was reacting to press publications of the Australian Broadcasting Company concerning a shift of work performed by Paramedics Pfeiffer, Bonilla, and Nunez." Dkt. No. 59-32 at 1.  The letter further explained that "[a]t no point did EMT Rugen or the Paramedics authorize anyone to go into the call locations or ride an ambulance with them," that the entry into a patient's home "was not authorized by or

even discussed with the EMS crew on the scene," and argued that "[t]he EMS crew committed no HIPAA violations because they had no discussions with the media crew about the patient's condition."  *Id.* at 2.  The letter also took issue with the fact that the decision was made to "discipline" Plaintiffs without having conducted an investigation into the matter and suggested that the FDNY's actions were retaliation for speaking to the press.  *Id.*

Plaintiffs further point to the evidence that none of Nunez, Pfeiffer, or Bonilla's partners on the relevant dates were referred to the DOI for possible misconduct or had their employment restricted even though, by at least June 3, 2020—before the employment restrictions on Plaintiffs were lifted—the FDNY knew who Nunez and Pfeiffer's partners were on the relevant dates. *See, e.g.*, Dkt. No. 59-34.  At his deposition, Palazzolo testified that Bonilla's partner was not referred to the DOI "because the partner wasn't quoted in the news articles or videos that [he] watched."  Dkt. No. 59-7 at 29; *see* Dkt. No. 72 ¶ 89.  He similarly testified that the reason only Nunez, Pfeiffer, and Rugen were referred to the DOI—and Pfeiffer's and Nunez's partners were not—was because only Nunez, Pfeiffer, and Rugen were quoted in the articles and videos that he read.  Dkt. No. 59-7 at 32; Dkt. No. 71 ¶ 94.  Plaintiffs also note that Defendants continued their restriction of Plaintiffs for over a month after Local 2507 sent Defendants the authorizations obtained by the Aus. BC reporters by the residents of the homes where filming by the Aus. BC crew occurred.  *See* Dkt. No. 72 ¶ 81 (explaining that "Local 2507 forwarded copies of the authorizations to the FDNY on May 15, 2020"); Dkt. No. 52 ¶ 8.

Plaintiffs further note that there is evidence that the FDNY did not refer to the DOI or restrict other paramedics who were featured in press videos where potentially sensitive patient information was disclosed.  *See* Dkt. Nos. 68–70; *see also* Dkt. No. 59-7 at 43 (Palazzo testifying that no referral was made in relation to article published on April 27, 2020 where paramedics are

shown taking a patient having trouble breathing into an emergency room and where the patient's face was visible); Dkt. Nos. 69–70 (declarations of paramedics in April 27, 2020 article noting that they were not notified that the article violated FDNY policy, and one paramedic stating his employment was not restricted); *cf. Smith*, 776 F.3d at 124–25 (finding genuine issue of fact where record contained evidence that other employees were not disciplined for unprotected conduct engaged in by plaintiff and noting that evidence that defendant had suspended or transferred others for unprotected conduct engaged in by plaintiff might suffice to meet summary judgment burden).

Finally, as a matter of fact, there is no contention in this case that Rugen, Nunez, Pfeiffer, or Bonilla actually engaged in violations.  Dkt. No. 72 ¶¶ 137–140.  The employment restrictions were lifted in June 2020, *see* Dkt. Nos. 59-24; 59-26; 59-29; 59-45, and Rugen's suspension was rescinded, Dkt. No. 77.  The FDNY ultimately concluded that there had not been HIPAA violations with regard to Plaintiffs' conduct.  *See* Dkt. No. 49-4 at 77; Dkt. No. 49-5 at 73.

Although the question is close, Plaintiffs' evidence is sufficient to give rise to a triable question regarding whether Defendants' actions would have been taken but for the content of their speech.  It cannot be disputed that Defendants had the authority to restrict and suspend Plaintiffs based on concern that their conduct compromised patient confidentiality.  The effective functioning of the FDNY EMTs depends on its ability to assure the persons whom it is serving that their confidential information will be protected.  The FDNY also has authority to take actions against some of those whom it believes might have engaged in prohibited conduct without taking action against others who might have engaged in that conduct, particularly when the evidence appears to be stronger or the culpability greater with respect to the former group than with respect to the latter group.  The short duration of the restriction argues powerfully in

support of the existence of a *Mt. Healthy* defense.  And the FDNY clearly is not required to lift a restriction or suspension upon simply receiving a letter defending the conduct of the employees engaged in misconduct or receiving exculpatory evidence; it is permitted to investigate whether that evidence is sufficient to overcome the concerns regarding a violation of rule.

The Second Circuit, however, has repeatedly emphasized that the burden is on a defendant to show that the only conclusion a reasonable jury could reach is that the defendant has established by a preponderance of the evidence that it would have taken the specific adverse action based on permissible reasons.  *See Smith*, 776 F.3d at 123 ("[D]efendants asserting a *Mount Healthy* defense . . . must also articulate and substantiate a reasonable link between [unprotected] misconduct and their *specific* adverse actions.  A general statement that the employer would have taken *some* adverse action will not suffice."); *see also Anemone*, 629 F.3d at 115 ("[A] defendant can 'avoid liability by showing that it would have taken the same action in the absence of the impermissible reason.'  The burden is on the government to make out the defense.").  "[I]t is insufficient to show that [defendants] *might have* or *could have* suspended or disciplined [plaintiffs] on some legitimate grounds."  *Zehner*, 666 F. App'x at 32.  In *Smith*, for example, a public employer undertook an investigation into an employee based on misconduct separate and apart from the employee's citizen-media speech; "[p]ractically speaking, the disciplinary wheels were in motion before the Department ever learned about [the employee's] protected speech."  776 F.3d at 123–24.  But the *Smith* Court nonetheless found that the defendants there had not met their burden of showing entitlement to the *Mt. Healthy* defense and cautioned that "[a] constitutionally sound investigation . . . does not insulate any resulting adverse actions from constitutional scrutiny."  *Id.* at 124.  Indeed, even the existence of unprotected conduct that violated Department policies is insufficient, standing alone, to support

such a conclusion if there is evidence that such violations would not have led to the adverse

actions.  And even if a jury *could* reasonably credit a defendant's argument and conclude that it

was motivated exclusively by a permissible motive, if there is credible evidence that the

defendant had "ulterior, impermissible motives in singling out [the plaintiffs] . . . 'it is for a jury

to attempt to disentangle the permissible from the impermissible reasons for [plaintiff's]

termination.'"  *Maher v. Town of Stony Point*, 2018 WL 4759786, at *9 (S.D.N.Y. Sept. 29,

2018) (quoting *Caruso v. City of New York*, 973 F. Supp. 2d 430, 433 (S.D.N.Y. Sept. 26,

2013)).  In contrast, the Circuit will uphold grants of summary judgment to defendants on *Mt.*

*Healthy* grounds where the evidence is such that a jury would be "compel[led] . . . to make a

preponderance finding" that a plaintiff would have suffered the adverse action even without the

protected speech.  *Weinstein*, 676 F. App'x at 4; *see also id.* (concluding that "the record

convincingly demonstrates, at *Mr. Healthy* requires, that the defendant would have taken the

same adverse action even if the impermissible reason had not existed" where the plaintiff was

nominated for reappointment for a position that he ultimately did not get—forming the adverse

action at issue—*after* making his protected speech, where he did not submit new application

papers for the position, and where the decisionmaker consistently cited "persistent opposition"

changes in the program the position would oversee as a reason for not appointing plaintiff);

*Anemone*, 629 F.3d at 117–18 (assuming *arguendo* that plaintiff spoke as a citizen on a matter of

public concern, defendants were entitled to summary judgment where there was "undisputed

evidence of [plaintiff's] insubordination and the [defendant's] ongoing efforts to address it . . .

beginning well before any allegedly protected conduct on [plaintiff's] part," and plaintiff

testified that, even before he made his speech, "he believed his job was in jeopardy").

Courts within this Circuit have found summary judgment on the *Mt. Healthy* defense to be inappropriate even where there was substantial evidence that a decision to terminate a public employee was the result of concerns about the employee's non-protected conduct.  In *Caruso*, for example, the district court found that the defendant was not entitled to summary judgment even given the defendants' "deep reservations" and "ongoing concerns" with the employee's relationships with a corrupt official, a "belligerent" reaction to a decision to transfer the employee, and other "unacceptable" and "insubordinate behavior" to a request for his resignation.  *See Caruso*, 973 F. Supp. 2d at 456.  The *Caruso* court, in considering a First Amendment retaliation claim for the employee who testified in front of a grand jury, also noted that a jury could credit the defendants' arguments that they were "dissatisfied" with the employee's poor judgment regarding the subject of the grand jury investigation—which did not relate to his speech but did reflect his competence in the role from which he was terminated—given the credible evidence in the record to support those conclusions.  *Id.* at 457.  However, the court also observed that many of the reasons provided for the employee's termination had also supported the employer's planned transfer of the plaintiff and that "there is evidence in the record from which a jury could conclude that the decision changed as a result of [the plaintiff's] grand jury testimony," including evidence that supervisors recognized the importance of the plaintiff's grand jury testimony in a future criminal proceeding and repeatedly discussed his testimony in the context of his termination.  *Id.* at 456.  "Thus, despite the . . . evidence that may support [d]efendants' termination of [the plaintiff]," the court held that "summary judgment must be denied, as 'the weighing of the evidence[] and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  *Id.* at 458 (quoting *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010)).  In *Scott v. Coughlin*, the Second Circuit vacated a grant

of summary judgment on the basis of the *Mt. Healthy* defense where there was a genuine issue of material fact existed regarding whether a plaintiff engaged in misconduct, which would justify an adverse action against the plaintiff.  344 F. 3d 282 (2d Cir. 2003).  There, the Circuit concluded that the district court "impermissibly drew an inference against plaintiff, the non-moving party, and [incorrectly] awarded summary judgment to defendant on the basis of that inference" when it interpreted the evidence to show that the plaintiff actually engaged in misconduct and that there was thus a proper motive for adverse actions, even though a reasonable jury could conclude otherwise.  *Id.* at 288–89.

Here, there is credible evidence that suggests Defendants restricted or suspended the individual Plaintiffs for a permissible reason, but there is also evidence from which a reasonable jury could find that the Defendants did so simply because they were employees who engaged in protected speech.  The role of the Court is not to weigh that evidence and determine which is the more likely scenario.  That must be left to the jury.  *See Caruso*, 973 F. Supp. 2d at 456. Because "[D]efendants have failed to demonstrate that a reasonable jury must conclude by a preponderance of the evidence that the Department would have taken these adverse actions absent [plaintiffs] having engaged in protected citizen-media speech," they are not entitled to summary judgment.  *Smith,* 776 F.3d at 125.

### C.     Whether Defendants' Adverse Action was Permissible under *Pickering*

"[E]ven if [an] employer does not establish that it would have discharged the employee in the absence of the protected conduct, it may nonetheless prevail if it can show" entitlement to the *Pickering* defense.  *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049 (2d Cir. 1993). "Under this defense, 'a government employer may take an adverse employment action against a public employee for speech on matters of public concern if: (1) the employer's prediction of the disruption that such speech will cause is reasonable; (2) the potential for disruption outweighs

the value of the speech; and (3) the employer took the adverse employment action not in retaliation for the employee's speech, but because of the potential for disruption.'" *Anemone*, 629 F.3d at 115.  Thus, even where a plaintiff makes a prima facie showing of First Amendment retaliation, "defendants may . . . escape liability if they can demonstrate that . . . the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression."  *Skehan*, 465 F.3d at 106.

The *Pickering* defense is different from the *Mt. Healthy* defense.  It does not rest upon a showing that the defendant would have taken the adverse action but for the content of the protected speech; it assumes that the action was taken based on speech that would be protected if not for its disruption to the government operations.  It rests upon the nature and content of that speech, construed favorably to the non-moving party, and considers the facts about the speech that the employer reasonably and in good faith believed at the time it undertook the adverse action.  *See Waters v. Churchill*, 511 U.S. 661, 677 (1994) (plurality opinion); *see also id.* at 686 (Souter, J., concurring) ("Though Justice O'Connor's opinion speaks for just four Members of the Court, the reasonableness test it sets out is clearly the one that lower courts should apply.").  As with the *Mt. Healthy* defense, the burden is on the defendants to show entitlement to the *Pickering* defense.  *See Anemone*, 629 F.3d at 115.

The Court's task "as . . . defined . . . in *Pickering*, is to seek 'a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'"  *Connick*, 461 U.S. at 142 (alteration adopted) (quoting *Pickering*, 391 U.S. at 568).  "The weighing of the competing interests is a matter of law for the court."  *Jackler*, 658 F.3d at 237.  In balancing the competing interests, a court must bear in mind

that "the state's burden in justifying a particular [adverse employment action] varies depending upon the nature of the employee's expression." *Connick*, 461 U.S. at 150.  "The more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown." *Lewis*, 165 F.3d at 162.  The nature of an employee's position also plays a significant role in the *Pickering* balancing:  "The more the employee's job requires confidentiality, policymaking, or public contact, the greater the state's interest in firing her for expression that offends her employer." *McEnvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir. 1997) (alteration adopted) (quoting Craig D. Singer, Comment, *Conduct and Belief: Public Employees' First Amendment Rights to Free Expression and Political Association*, 59 U. Chi. L. Rev. 897, 901 (1992)).  "The government bears the burden of demonstrating that the speech threatens to interfere with government operations." *Lewis*, 165 F.3d at 162.

*Pickering* "generally governs a public employee's right to speak out on matters of public concern," and the *Pickering* line of cases "define the parameters of a public employer's right to take adverse action against an employee for the exercise of [this] First Amendment right[]." *McEvoy*, 124 F.3d at 97–98.  The upshot of the *Pickering* defense is the conclusion that, under the circumstances, the employer is entitled to take adverse action against the speaker based on his or her speech notwithstanding the First Amendment.  *Pickering* outlines when a public employee can "be retaliated against based on protected speech." *Morin v. Tormey*, 626 F.3d 40, 44 (2d Cir. 2010); *see also McEvoy*, 124 F.3d at 98 (explaining that a court must determine "whether the disruption" speech has on the "effective operation of the workplace" "justifies the employer's attempt to stifle the employee's expressive activity").  Thus, "for the *Pickering* line of cases to apply, there must be an expression of views." *Morin*, 626 F.3d at 43.

"To satisfy *Pickering* and justify adverse action arising out of an employee's protected activity, the government has the burden to show that the employee's activity is disruptive to the internal operations of the governmental unit in question."  *Melzer v. Bd. of Educ. of City Sch. Dist. of City of New York*, 336 F.3d 185, 197 (2d Cir. 2003).  "Any actual disruption that has already occurred is of course a persuasive argument for the government that it has met its burden, but even a showing of probable future disruption may satisfy the balancing test, so long as such a prediction is reasonable."  *Id.*  Indeed, the Supreme Court has "given substantial weight to government employers' reasonable predictions of disruption."  *Waters*, 511 U.S. at 673. While, as a general rule, "the test is a matter of law for the district court to apply, . . . where there are questions of fact relevant to that application . . . 'the question of the degree to which the employee's speech could reasonably have been deemed to impede the employer's efficient operation [may] properly be regarded as a question of fact, to be answered by the jury prior to the [district] court's application of the *Pickering* balancing test.'"  *Ganim*, 342 F.3d at 114 (quoting *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 557 (2d Cir. 2001)); *see also Caruso*, 973 F. Supp. 2d at 458 ("The *Pickering* balancing test is 'generally a matter of law for the Court to decide, but in some instances, questions of fact will need to be resolved by a factfinder before the [C]ourt can apply the test.'" (quoting *Pisano,* 2011 WL 1097554, at *9)).

Defendants articulate a strong governmental interest.  The FDNY has a powerful interest in investigating suspected violations of HIPAA and the compromise of patient information; "the potential to disrupt the FDNY's operations and that harm caused would be significant."  Dkt. No. 63 at 17; *see McEnvoy*, 124 F.3d at 103.  The FDNY, as a covered entity under HIPAA, has legal obligations to protect patient confidentiality and "a duty to investigate any suspected breach of the HIPAA within a confined time frame" and to notify the patient and federal government if a

breach is found.  Dkt. No. 63 at 17–18.  The disclosure of confidential patient information can

compromise the mission of the EMTs.  Moreover, as Defendants explain, the FDNY has an

interest in making sure that Plaintiffs not "continue to conduct themselves in manner [sic] that

would lead to further HIPAA breaches," in part from the fact "that the plaintiffs had not sought

permission from FDNY to give the interviews," had not "notified the FDNY of their actions,"

and had not made "any attempt to obtain authorizations from any of the patients."  *Id.* [7]  It surely

is the case that when there is a reasonable risk that a member of the FDNY who has access to

confidential patient information may violate HIPAA, the FDNY can take "immediate

prophylactic action" "to prevent further disruption of their operations by having to launch time-

sensitive investigation of potential breaches and make requisite notifications" and "to prevent

future harm of having other patients' protected health information disclosed without

authorization," including by temporarily taking the employees at issue out of the position where

they could compromise patient information.  *Id.*

As a threshold matter, however, many of those arguments with respect to Plaintiffs

Bonilla, Nunez, Pfeiffer do not appear to be properly framed as a *Pickering* defense at all.  *See*

*Gala v. City of New* York, 525 F. Supp. 3d 425, 431 (E.D.N.Y. 2021) ("*Pickering* does not quite

fit the allegations of this case.").  It was not the Plaintiffs' protected speech that could give rise to

the concerns regarding the disclosure of confidential patient information—and the disruption to

the operations of the FDNY EMTs that could ensue from that disclosure—but rather their

---

[7] Plaintiffs make arguments with respect to the operative policy for interacting with the press that
was in effect at the time of their interactions with the media.  Dkt. No. 64 at 25.  Defendants,
however, frame the potential for disruption at issue here as the harm that would result from
revealing confidential health information and address Plaintiffs' interaction with the press
without prior permission only insofar as it relates to their belief for why there may have been a
HIPAA violation.  They do not rely upon the governmental disruption that would result from
violation of the media policy alone.

unprotected conduct and unprotected speech.  Statements those Plaintiffs made while they were

performing their job responsibilities—putting on PPE to respond to a call for Bonilla, or

speaking to a patient while administering oxygen to her for Pfeiffer—were made pursuant to

their official duties and are thus not protected from retaliation as citizen speech.  *See Lynch v.

Ackley*, 811 F.3d 569, 578 (2d Cir. 2016) ("[S]peech made by employees 'pursuant to . . . official

duties' rather than 'as a private citizen' is not protected from retaliation." (quoting *Garcetti*, 547

U.S. at 421–22)); *cf. Connick*, 461 U.S. at 146 (explaining that if the employee's speech "cannot

be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for

us to scrutinize the reasons for her discharge").  Nor are the images of Plaintiffs engaged in

patient care, including entering and exiting residences to respond to calls, which no party

disputes fall squarely within the job responsibilities of a paramedic and which otherwise cannot

be fairly said to represent "an expression of views" necessary for the *Pickering* defense to apply.

*Morin*, 626 F.3d at 43; *see also Harman*, 140 F.3d at 117 ("*Pickering*'s balancing test applies

only when the employee speaks 'as a citizen upon matters of public concern' rather than 'as an

employee upon matters only of personal interest.'" (quoting *Connick*, 461 U.S. at 147)).

*Pickering* seeks to "arrive at a balance between the interest of . . . *a citizen, in commenting upon

matters of public concern* and the interest of the State, as an employer, in promoting the

efficiency of the public services it performs through its employees."  391 U.S. at 568 (emphasis

added); *see also Garcetti*, 547 U.S. at 419 ("*So long as employees are speaking as citizens about

matters of public concern*, they must face only those speech restrictions that are necessary for

their employers to operate efficiently and effectively." (emphasis added)); *Connick*, 461 U.S. at

149 (explaining that, because speech "touched upon a matter of public concern, and contributed

to [plaintiff's] discharge, [the Court] must determine whether" the discharge was justified under

*Pickering*).  As to these statements and this conduct, Defendants would have a complete defense if the adverse action were based on them under *Mt. Healthy* rather than under *Pickering*.  The Court need not consider whether the governmental interest in efficiency outweighs the employee interest in unprotected speech.

The *Pickering* defense is relevant to other of Plaintiffs' speech.  Assuming that Defendants took their adverse actions based on that other speech, *Pickering* would provide a defense if the governmental interest in efficiency outweighed the interests of those Plaintiffs, as citizens, in speaking out on matters of public concern.  There is a genuine factual question here, however, with respect to whether the otherwise protected speech of Plaintiffs could reasonably have given rise to the risk that Defendants assert justified the adverse action.  *See Anemone*, 629 F.3d at 115; *Gusler v. City of Long Beach*, 715 F. App'x 68, 70 (2d Cir. 2018) (summary order) ("In some cases the 'question of the degree to which the employee's speech could reasonably have been deemed to impede the employer's efficient operation is properly regarded as a question of fact to be answered by the fact finder before application of the *Pickering* balancing test.'" (alterations adopted) (quoting *Ganim*, 342 F.3d at 114)).

The Court recognizes that in considering whether the potential for disruption outweighs the value of citizen speech on a matter of public concern, "Defendants need not present evidence that such harm or disruption . . . has in fact occurred."  *Smith*, 776 F.3d at 119.  The government employer need only have "made a 'reasonable determination that the employer's speech creates the potential for such harms.'"  *Id.* (quoting *Piscottano*, 511 F.3d at 271); *see also Waters*, 511 U.S. at 679–80.  That is, even if the employee's speech does not actually lead to government disruption, a public employer can take adverse action in response to it if the employer "make[s] a reasonable determination that the employee's speech creates the potential for such harms." *See*

*Piscottano*, 511 F.3d at 271.  "[D]eference to the government's assessment of potential harms to

its operations is appropriate when the employer has conducted an objectively reasonable inquiry

into the facts." *Id.*

There is reason to question whether the "employer's prediction of the disruption that

[Bonilla's protected speech] will cause is reasonable." *Anemone*, 629 F.3d at 115.  Bonilla

commented about the high number of COVID calls in the City and the increased suffering as a

result of COVID, as well as her reaction to the fate of one patient, where she stated, "This one is

hard, it's so hard.  So young, young kids, youngest boy is three, and you can't do nothing."  That

speech did not "depict protected health information, including potential serious breaches of

patient confidentiality revealing the patient's face, body, age, home, treatment, and medical

status."  Dkt. No. 62 at 18.  The first two comments were about the impact of COVID on New

York City and the challenges presented to first responders.  Those comments alone could not

have given rise to any concern that Bonilla was compromising patient information.  Bonilla's

statement regarding the fate of a patient did concern patient information but there is no credible

argument that it could have given rise to concern that she was compromising patient information

or was a risk to do so in the future.  According to the FDNY's Deputy General Counsel who

oversees the Office of Health Care Compliance, PHI includes "any identifiable health

information that identifies the individual or for which there is a reasonable basis to believe it can

be used to identify the individual," Dkt. No. 60 ¶ 11, and:

> Examples of patient identifiers that can identify an individual or reasonably lead to
> the identification of an individual include, but are not limited to: names and
> addresses, medical record numbers, social security numbers, account numbers,
> license or certification numbers, vehicle identifiers such serial numbers or license
> plate numbers, internet protocol addresses, health plan numbers, any dates related
> to the individual except year such as birthdays or dates of incident, full face
> photographic images, any comparable images, or biometric identifiers such as a

fingerprint, or any other unique identifying number, characteristic or code.  *See* 45
CFR § 164.514(b).

*Id.* ¶ 12.  The only information Bonilla gave regarding the patient was that she was "so young," a
description that could fit many who were victims of the pandemic sweeping the country.  *See*
Dkt. No. 71 ¶ 26.

The same can be said about the protected speech of Nunez and Pfeiffer.  Nunez made
statements to the Aus. BC reporters regarding: the difficulties he faced working as a paramedic
during the pandemic; being unable to bring an unidentified woman "back," implying  that she
passed away; and individuals staying home to recover from COVID instead of seeking treatment
at a hospital.  Pfeiffer made comments about her emotional state due to the strains of the
pandemic, her fears of passing the virus onto her loved ones, her fears about the effect that the
early days of the pandemics will have on first responders for years to come, and the physical
effect that COVID is having on unidentified patients.  Those comments too are of public concern
because of what they convey generally about the impact of COVID on the population of New
York and the challenges faced by EMS personnel.  However, none of those comments
reasonably could give rise to any concern that Plaintiffs were compromising patient information.
Nunez's comment about a woman who died from COVID did not provide any additional
information about that woman, and Pfeiffer did not reference individual cases that revealed
private health information in her public-citizen speech.  On the record before it, the Court cannot
conclude as a matter of law that the FDNY was justified by the governmental interest it asserts in
taking action against Bonilla, Nunez, or Pfeiffer based on these comments, which are the only
parts of their protected speech that could even arguably give rise to a concern about revealing
PHI, or based on the mere fact that they interacted with the media to make these comments.

Finally, Rugen's protected speech and activities consisted of statements he made about the effect the pandemic was having on EMS personnel like him and in transporting the Aus. BC crew around the City and tailing an ambulance.  Defendants argue that Rugen was suspended "because of his perceived violation of HIPAA and the FDNY's belief that he was using his position as EMT to disseminate patient information" without prior permission or patient authorization.  Dkt. No. 63 at 17.  But the record evidence is such that a jury could conclude that it was not reasonable to believe that Rugen had violated HIPAA or used his position to disseminate patient information and thus would interfere with government operations by violating it in the future.  The evidence suggests that Rugen's role in the Aus. BC article that purportedly formed the basis for the action taken against him was simply to transport the film crew on a "ride-along" without previously informing the FDNY that he was going to do so.  He drove them in his personal vehicle and followed an FDNY ambulance on two different days that he was not working, just as any private citizen might do.  There is no evidence that he informed the film crew that they could enter residences where patients were being treated and filmed there.  Nor is there evidence he knew that the film crew would attempt to talk to patients without their advance consent.  The Court cannot say that simply because, after he permitted them to ride with him, the film crew entered the building and filmed patients being cared for, it was reasonable to assume that the off-duty Rugen had somehow authorized that filming in violation of HIPAA or, more particularly, that he presented a risk that he would cause a violation of HIPAA in the future.

Defendants are not entitled to take advantage of the *Pickering* defense at this juncture, and a jury should have the opportunity to resolve whether their "concern about disruption was reasonable."  *Reuland*, 460 F.3d at 419.

### D.      Whether Defendant Carlos Velez Is Entitled to Qualified Immunity

"An officer may take advantage of qualified immunity, and thereby avoid liability for civil damages and the burdens of a lawsuit, if he demonstrates that his conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lennox v. Miller*, 968 F.3d 150, 155 (2d Cir. 2020) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)).  "There are therefore two steps to the qualified immunity analysis: first, whether the plaintiff established that his constitutional rights were violated, and second, whether the right at issue was 'clearly established' at the time of the alleged violation." *Bacon v. Phelps*, 961 F.3d 533, 542 (2d Cir. 2020) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  The Court first construes disputed facts in favor of the plaintiffs but then is required to "dismiss the claim if, at the time of the defendant's conduct, the law was unclear whether the facts so construed, constituted a violation of the plaintiff[s'] constitutional rights." *Lynch*, 811 F.3d at 573.

Whether Velez is entitled to qualified immunity at this juncture therefore depends on whether at the time he took adverse actions against Plaintiffs in April 2020, he was violating Plaintiffs' clearly established rights.  Because Velez's conduct "does not violate clearly established . . . constitutional rights of which a reasonable person would have known," *Kisela*, 138 S. Ct. at 1152, he is entitled to qualified immunity.

"[T]he need for 'clearly established' law is satisfied if the law on the subject was defined at the time with reasonable clarity or clearly foreshadowed in rulings of the Supreme Court or the Second Circuit, so that the defendant should have understood that her conduct was unlawful." *Lynch*, 811 F.3d at 582.  At the highest level of generality, by April 2020, "it was clearly established law that a public employer violated the law by retaliating against a public employee for speaking as a citizen on a matter of public concern." *Spencer v. Philemy*, 540 F. App'x 69,

72 (2d Cir. 2013) (summary order); *see also Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 211 (2d Cir. 2002) ("It is clearly established that . . . the First Amendment . . . prohibits [a governmental entity] from punishing its employees in retaliation for the content of their speech on matters of public importance.").  However, "[c]ourts are cautioned not to define clearly established law at 'a high level of generality,'" and "'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Lennox*, 968 F.3d 156–57 (quoting *Kisela*, 138 S. Ct. at 1152).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), but it is not necessary that there is "a case directly on point for a right to be clearly established," *White v. Pauley*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and citation omitted).

The Second Circuit has instructed that, in considering a claim of qualified immunity, the Court is not limited to the general question of whether it was clearly established that an employer may not take adverse action against an employee for her citizen speech but also must consider whether it was clearly established that the particular speech was made by the employee as a citizen, *see Montero*, 890 F.3d 386, whether it was also clearly established that the alleged retaliatory actions constituted *prohibited* retaliation, *see Lynch*, 811 F.3d at 579, whether it was further clearly established that the speech at issue "asserted a matter of public concern rather than a 'personal grievance,'" *id.* at 581, and whether it was clear that the plaintiff's interest in her speech would outweigh the government's interests in preventing disruption of the workplace, *id.* at 583.  A public official is entitled to qualified immunity if "a reasonable employee would not have been on notice that [the plaintiff's speech] involved a matter of public concern and [where] the law on whether [a particular type of speech is] private speech was not clearly established at the time." *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 91 (2d Cir. 2020).

Defendants argue that Barzilay and Rugen spoke to the media as part of the Union's press campaign to highlight the working conditions faced by Union members during the pandemic and that Nunez and Bonilla spoke to the press at the behest of the Union to highlight the working conditions of EMS members during the pandemic and their personal experiences.  Dkt. No. 63 at 21–22.  They argue that it was not clearly established as of April 2020 that Plaintiffs' speech was as a private citizen on a matter of public concern.  *Id.*  In particular, Defendants rely upon *Montero v. City of Yonkers*, in which the Second Circuit held that a police officer and former union official in the Yonkers Police Benevolent Association ("PBA") spoke as a citizen on a matter of public concern in criticizing management decisions by police officials at two PBA meetings but granted qualified immunity because it was not clear at the time the speech was made that the plaintiff was speaking as a citizen when he spoke in his union capacity.  890 F.3d 386.  Defendants point out that the Second Circuit expressly "decline[d] to decide categorically that when a person speaks in his capacity as a union member, he speaks as a private citizen" and instead decided the case on the facts before it.  *Id.* at 399.

Plaintiffs do not dispute that they made their comments to the press as part of a Union campaign, Dkt. No. 64, at 49, but they argue that there is nothing about the context in which they made their comments or their motive for doing so that would make their speech anything other than "citizen speech" clearly protected under the First Amendment against retaliation at the relevant time period, *id.* at 47–48.

It is a close question whether Velez is entitled to qualified immunity.  In *Lynch*, the Second Circuit held that a claim did not lie against a police chief who retaliated against a patrolman who had filed a grievance protesting against the chief's presence at a union meeting discussing the Department's flex-time policy and who had communicated negative views about

the chief's leadership of the department to town leaders and the public at large.  811 F.3d 569.

With respect to the former category of comments, the court held that it was far from clear that

the speech was of public concern.  The court recognized that the concerns expressed by the

plaintiff were "shared by numerous employees" and accepted that it "relate[d] to the delivery of

services to the public, or … invoke[d] basic aspects of the right to unionization."  *Id.* at 581.  The

court nonetheless held that the chief was entitled to qualified immunity on the claim that she

discriminated against the plaintiff for the grievance because it had "a strong flavor of 'personal

grievance.'"  *Id.*  The court cited *Ruotolo v. City of New York*, 514 F.3d at 189, in which the

court distinguished between speech that was calculated to redress a personal grievance and

which therefore was not protected and speech that sought "to advance a public purpose," and

which was protected.  With respect to the latter category, the court held that because the whole

purpose of plaintiff's speech was to undermine the chief's ability to administer the department

effectively, the plaintiff's "actions were sufficiently disruptive as to render at least unclear

whether his free-speech interest outweighed [the chief's] interest in the effective management of

the Police Department."  *Lynch*,  811 F.3d at 583.

Applying those principles here, the protected speech of Bonilla, Pfieffer, and Nunez, and

the statements uttered by Rugen, all have some flavor of a "personal grievance."  The speech

touched on personal matters—the effect that the pandemic was having on the individual

Plaintiffs, their reactions to the fate of patients in their care—and their working conditions.

Although given the forum in which the speech was made (to the media) and its context (a

pandemic of historic proportions and as exemplars of the experiences of other first responders)

the Court has concluded that the speech was of public concern, the Court also cannot say that the

law was so clearly established at the time that only "the plainly incompetent or those who

knowingly violate the law," would have reached a contrary conclusion.  *Malley*, 475 U.S. at 341.

There is sometimes a thin line separating that speech which is of private concern and that which

is of public concern.  As with the labor-management disputes at issue in *Lynch*, it would not be

difficult for a plaintiff "to construct an argument" that virtually any speech addressing the

challenges a first responder was addressing at the time of the pandemic in March 2020 was "a

matter of public concern."  811 F.3d at 581.  Plaintiffs' argument thus proves too much.  It would

deprive a public official of the right to make a reasonable judgment that speech is of a private

nature and not of a public concern.  In the absence of any more direct precedent as of 2020

supporting that Plaintiffs' speech was of a public concern, the Court declines to hold that Velez

violated clearly established law by concluding that the speech was not protected under the First

Amendment from retaliation.  Although plaintiff's speech was made to members of the media,

the Court's conclusion is further bolstered by the context in which the speech could have

reasonably been understood—not as part of a campaign to achieve a public purpose but rather to

advance the personal interests of Plaintiffs and those who were similarly situated.  Thus, it is not

so much that employees who are also union members or speaking in connection with a union

campaign do not have clearly established First Amendment rights (as Defendants would put it),

but whether in speaking to advance the union's interests and not more generally the interests of

the public, they are clearly speaking on a matter of public concern.

A similar conclusion follows for the second element of Rugen's speech.  There are two

elements of Rugen's protected speech: his expressive conduct in guiding members of the media

to locations where EMTs were delivering services.  The law was not clearly established as of

2020 that a public employee had a First Amendment right to take media personnel on a ride-

along where sensitive information could be disclosed.  To be sure, the Second Circuit and the

Supreme Court have emphasized the importance of speech about governmental activities and the role that the media can play in contributing to public commentary about such activities.  *See, e.g.*, *Harman*, 140 F.3d at 118; *Wilson v. Layne*, 526 U.S. 603, 612–13 (1999) (quoting *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491–92 (1975), for the observation that "in a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations").

In recognition of the public concern such speech engenders, the Second Circuit has found unconstitutional a "blanket policy" that prohibits public employees from conveying, or committing to convey, any information to the media "regarding any policies or activities of the [a]gency [employer]" without prior approval, even when such a policy was supposedly imposed to protect confidential and sensitive information.  *Harman*, 140 F.3d at 116, 122–24.  In so holding, the court balanced the government interests at stake with public employees' free speech rights and found impermissible such a prior restraint that barred speech as a matter of course because the government agency did not show the policy at issue was "designed to address the asserted harm in a 'direct and material way'" and was thus "overbroad" and had "the potential to chill substantially more speech than is reasonably necessary to protect the confidential information."  *Id.* at 123.  Implicit in the Circuit's decision in *Harman* is that public employees do not generally have an *unqualified* right to interact with the media about things related to their employment—under certain circumstances, the government interest may outweigh such communication, just as it can any otherwise protected speech.  Indeed, the Supreme Court has disallowed the practice of media ride-alongs during the execution of a warrant, concluding that an individual's privacy interest in her own home is so weighty that such a practice violates the

Fourth Amendment. *See Wilson*, 526 U.S. at 614. Given that there is no unqualified right to a public employee bringing the media on a ride-along, a determination of whether Rugen's conduct is ultimately entitled to protection from retaliation will depend on the outcome of a balancing of the government's interest in protecting confidentiality and the efficient and effective operation of the FDNY. *See, e.g.*, *Harman*, 140 F.3d at 121–24; *Pickering*, 391 U.S. at 568. The privacy rights in the information the media could obtain from such a ride-along are substantial, *see, e.g.*, *Wilson*, 526 U.S. at 614, and the government has a substantial interest in keeping confidential such information. Because there is no authority that clearly establishes that Rugen's interest in transporting the media would outweigh the FDNY's governmental interest in such privacy rights, the Court is not able to identify any clearly established law that Velez violated in concluding that Rugen's speech was not protected by the First Amendment against employer action.

## II.    Fourteenth Amendment Due Process Claim

Defendants also move for summary judgment on Plaintiffs' Fourteenth Amendment due process claims. The complaint alleges that Defendants deprived Plaintiffs of liberty and property interests in their employment in violation of the due process clause.

Plaintiffs cross-move for summary judgment on their liberty interest claim.

"[T]o prevail on a Section 1983 claim for violation of the procedural due process rights guaranteed by the Fourteenth Amendment, the plaintiff must show (1) that he possessed a protected liberty or property interest; and (2) that he was deprived of that interest without due process." *BaRoss ex rel. BaRoss v. Greenlawn Volunteer Fire Dep't, Inc.*, 2021 WL 930254, at *7 (E.D.N.Y. Mar. 10, 2021) (quoting *Jackson v. Roslyn Bd. of Educ.*, 652 F. Supp. 2d 332, 338–39 (E.D.N.Y. 2009)).

Constitutionally protected property rights "stem from an independent source such as state law rules or understandings that secure certain benefits, and that support claims of entitlement to those benefits." *Luck v. Mazzone*, 52 F.3d 475, 477 (2d Cir. 1995) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)); *see also Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) (recognizing that a benefit is not a protected entitlement "if government officials may grant or deny it in their discretion"). Further, for a person to have a property interest in a property-sourced benefit, the person "must have more than an abstract need or desire for it" and "more than a unilateral expectation of it." *Roth*, 408 U.S. at 577. "He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." *Id*.

The liberty interests protected by the Due Process Clause of the Fourteenth Amendment include the freedom to "engage in the common occupations of life." *Id*. at 572 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). At the same time, the Supreme Court has recognized that government entities may regulate occupations when circumstances require it necessary to protect the public's interests. "The Fourteenth Amendment does not prevent legislation intended to regulate useful occupations which, because of their nature or location, may prove injurious or offensive to the public." *Adams v. Tanner*, 244 U.S. 590, 596 (1917) (quoting *Murphy v. California*, 225 U.S. 623, 628 (1912)).

### A.  Plaintiffs' Deprivation of Property without Due Process Claim

Defendants move for summary judgment on Plaintiffs' claims that they were deprived of a property interest without due process. Defendants argue that Nunez, Bonilla, Pfeiffer, and Rugen cannot identify a protected property interest because "there is no constitutional right to overtime, type of assignment or similar benefits; nor is there any language in their collective

bargaining agreement that gives rise to a protected property interest in these benefits."  Dkt. No. 63 at 25.  Defendants also argue that, when Rugen was suspended, he was afforded due process in that he was given notice of his suspension and was informed of the grounds for his suspension, including the date of the alleged misconduct and the rules and regulations believed to have been violated, and his counsel was "permitted to . . . refute the allegations set forth in the notice and provide plaintiff's defense for his actions."  *Id.* at 28; *see also id.* at 27–28.  Defendants continue that even if Plaintiffs were deprived of a property interest, their due process claims would still fail because they had adequate post-deprivation remedies available to them, including making a grievance under their CBA or pursuing an Article 78 special proceeding.  *Id.* at 28.

Plaintiffs do not defend their claims that Defendants deprived them of constitutionally protected property rights.  "Where . . . a counseled non-moving party submits 'a partial response arguing that summary judgment should be denied as to some claims while not mentioning others,' that response 'may be deemed an abandonment of the unmentioned claims.'  Even '[w]here abandonment by a counseled party is not explicit,' a court may infer abandonment 'from the papers and circumstances viewed as a whole.'"  *Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. 2016) (summary order) (quoting *Jackson v. Fed. Express*, 766 F.3d 189, 195–96 (2d Cir. 2014)).  "'[A] partial response [generally] reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others,' and 'a court may . . . infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.'"  *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (quoting *Fed. Express*, 766 F.3d at 196, 198).

In their opposition to Defendants' motion for summary judgment, Plaintiffs do not address Defendants' arguments with respect to their alleged property interests or any associated

deprivation of due process, instead focusing their nearly fifty-page brief on their alleged First

Amendment liberty interest, including the inadequacy of post-deprivation remedies in the context

of this interest.[8]  *See generally* Dkt. No. 64.  In their brief in support of their motion for partial

summary judgment, Plaintiffs argue why they are entitled to summary judgment on the issue of

"Defendants' liability for depriving Plaintiffs of their *liberty* interests without due process."  Dkt.

No. 57 at 1 (emphasis added); *see also id.* at 18 ("Thus, the 'restrictions' and suspension

imposed by FDNY infringed Plaintiffs' liberty interest in pursuing the profession that they had

dedicated their lives to pursuing . . . .").  In light of this, "an inference [of abandonment] may be

fairly drawn from the papers and circumstances viewed as a whole," and the Court concludes

that "abandonment was intended."  *Fed. Express*, 766 F.3d at 196.  Because Plaintiffs abandoned

their claim that they were deprived of a property interest without due process, Defendants are

entitled to summary judgment on this claim.  *See BWP Media USA Inc. v. Polyvore, Inc.*, 922

F.3d 42, 44 (2d Cir. 2019) (per curiam) ("We agree with the district court, however, that

Polyvore is entitled to summary judgment on BWP's secondary infringement claims of

contributory, vicarious, and inducement of infringement because the district court found that

BWP abandoned those claims.").

 Even if Plaintiffs had not abandoned this claim, it would fail.  "The threshold issue is

whether [P]laintiffs assert a property interest protected by the Constitution."  *Danese v. Knox*,

827 F. Supp. 185, 190 (S.D.N.Y. 1993).  "While property interests are constitutionally protected,

they are not generally constitutionally *established*; rather, 'they are created and their dimensions

are defined by existing rules or understandings that stem from an independent source such as

---

[8] In this brief, Plaintiffs also argue that the *Monell* doctrine does not bar their claims against the City and that Velez is not entitled to qualified immunity.

state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Velez v. Levy*, 401 F.3d 75, 85 (2d Cir. 2005) (quoting *Roth*, 408 U.S. at 577). Thus, "[t]o have a property interest in a benefit, a person . . . must . . . have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577.

Plaintiffs allege that their property interests were implicated by their placement on restricted status, during which time they were unable to earn overtime, holiday pay, and meal pay and had a change of assignment, were unable to wear their uniforms, and were denied promotional opportunities.[9] Though a contractual agreement may, in some circumstances, give rise to a property interest of which an individual cannot be deprived without due process, "not every contractual benefit rises to the level of a constitutionally protected property interest." *Adams v. N.Y.S. Educ. Dep't*, 752 F. Supp. 2d 420, 454 (S.D.N.Y 2010), *aff'd sub nom. Ebewo v. Fairman*, 460 F. App'x 67 (2d Cir. 2012) (quoting *Ezekwo*, 940 F.2d at 782); *cf. Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 314 (2d Cir. 2002) ("We have repeatedly recognized that a collective bargaining agreement may give rise to a property interest in continued employment.").

---

[9] The Court assumes that Rugen would have been deprived of a property interest for his suspension without pay, but it is undisputed that his suspension was rescinded and that he would be remunerated "for the equivalent pay that was withheld during the period of suspension." Dkt. No. 77 at 1 (internal quotation marks omitted). "Under this Circuit's precedents, . . . an employee who is suspended is not deprived of a protected property interest '[so] long as the employee is receiving a paycheck equivalent to his normal salary.'" *Waronker v. Hempstead Union Free Sch. Dist.*, 788 F. App'x 788, 793 (2d Cir. 2019) (summary order) (quoting *Tooly v. Schwaller*, 919 F.3d 165, 173 (2d Cir. 2019)); *cf. O'Connor v. Pierson*, 426 F.3d 187, 199 (2d Cir. 2005) (explaining that "no court has held that an employee on fully paid leave has been deprived of a property right merely by virtue of being relieved of his job duties"). "An employee who initially receives an erroneous notice of suspension without pay but has that pay promptly restored has not been deprived of a constitutionally protected interest." *Huda v. N.Y.C. Health & Hosps. Corp.*, 2021 WL 1163975, at *3 (S.D.N.Y. Mar. 26, 2021) (Nathan, J.); *see also id.* ("Second Circuit precedent does not recognize suspension with pay as a violation of any property interest in public employment."). The Court will therefore consider whether Rugen's restriction—like the restriction of the other individual Plaintiffs—deprived him of a constitutionally protected interest.

As a general matter, "'[p]laintiffs do not have property interests in the insubstantial aspects or discretionary benefits of their employment,' and courts in this Circuit have found that "'disputes over overtime, over work assignments, over lunch and coffee breaks do not implicate the great objects of the Fourteenth Amendment.'" *Adams v. N.Y.S. Educ. Dep't*, 752 F. Supp. 2d at 454 (first quoting *Kane v. Krebser*, 44 F. Supp. 2d 542, 549 (S.D.N.Y. 1999), then quoting *Boyd v. Schembri*, 1997 WL 466539, at *3 (S.D.N.Y. Aug. 13, 1997)).

Here, there is no evidence to support Plaintiffs' entitlement to the things they complain they lost. *See White Plains Towing Corp.*, 991 F.2d at 1062 ("An interest that state law permits to be terminated at the whim of another person is not a property right that is protected by the Due Process clause."). While Plaintiffs argue that others were able to work overtime during the time they were restricted and that they thus lost out on income that they would have obtained from working overtime, they point to no evidence that they had a right to work such overtime. *See* Dkt. No. 72 ¶¶ 32, 36, 39 (explaining that, while Plaintiffs Bonilla, Nunez, and Pfeiffer were restricted, they were not permitted to work overtime for the FDNY but unrestricted EMTs and paramedics performing field duties were required to work twelve-hour shifts, resulting in overtime earnings); Dkt. No. 71 ¶ 109; *Rolon v. Henneman*, 517 F.3d 140, 148 (2d Cir. 2008) (holding that plaintiff who "submitted no rules or understandings to prove that he had a legitimate claim to overtime" and submitted a page from a collective bargaining agreement granting "managerial rights to assign overtime" failed to adequately allege an unconstitutional deprivation of property). The relevant CBA does not appear to provide a right to work overtime; it provides only that *if* an employee does work overtime, she "shall continue to be reimbursed at overtime rates applicable to work performed beyond 40 hours per week on a minute for minute

basis."  Dkt. No. 59-15 § 2(c); *see also* Dkt. No. 59-6 at 126 (Velez testifying that "overtime is discretionary").

Nor do Plaintiffs adduce any evidence that they were entitled to receive night-differential pay or meal or holiday pay—which the evidence shows are provided when a paramedic or EMT works a shift in the field and cannot be released from duty for a meal (meal pay) or is required to work a holiday (holiday pay), Dkt. No. 59-2 at 82; Dkt. No. 59-3 at 52–53; Dkt. No. 59-4 at 59–60—or that they were entitled to work in conditions that would have given rise to these allowances.  They argue only that they would have been paid these amounts if they were not restricted, and it is undisputed that they resumed their ability to earn these amounts once their restrictions were lifted and they resumed patient-care/field-related duties.  *See, e.g.*, Dkt. No. 71 ¶¶ 111, 118, 123, 128.  But despite engaging in extensive discovery, Plaintiffs do not provide evidence of "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Roth*, 408 U.S. at 577; *see also Arteta v. Cnty. of Orange*, 141 F. App'x 3, 7 (2d Cir. 2005) (summary order) (explaining that "if, because of reassignment to a different department, an employee no longer qualifies to receive overtime for a job classification that he or she is no longer in and for duties that he or she can no longer perform, it does not seem that the employee has been deprived of a property interest under" a CBA that indicates at most that an employee has a property interest in receiving overtime when he or she qualifies to do so based on . . . the specific duty that is to be assigned").  While, at summary judgment, a court is required to "construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor," "a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Jeffreys v. City of New York*, 426 F.3d 549, 553–54

(internal quotation marks and citation omitted).  Plaintiffs have not offered any such evidence from which a reasonable factfinder could conclude that Plaintiffs had an entitlement that could give rise to a property interest in the overtime, meal and holiday pay, or night differential that they lost while on restricted status.

Both because Plaintiffs have abandoned their argument that they have been deprived of a property interest without due process and because Plaintiffs have adduced no evidence to support their claims of entitlement, Defendants are entitled to summary judgment on this claim.

### B.       Plaintiffs' Deprivation of Liberty Interests without Due Process Claim

Plaintiffs and Defendants each move for summary judgment on Plaintiffs' claim that Defendants' actions deprived them of liberty interests without due process.  Plaintiffs argue that the restrictions imposed on their employment deprived them of the protected liberty interest in pursuing the occupation of their choice, both by (1) denigrating their reputations in connection with an adverse employment action and publishing that stigmatizing characterization in a way that makes it difficult to obtain another job in the same field, and (2) imposing restrictions that "barred Plaintiffs from working as EMTs and Paramedics in New York City's 911 system—not just as employees of the FDNY, but as employees for any of the hospitals that supply ambulances in that system."  Dkt. No. 57 at 21; *see also id.* at 18–27.

Plaintiffs' first theory sounds in a "stigma plus" claim; under this theory, a defamation action "can be grounded in 42 U.S.C. § 1983 when [the] plaintiff can demonstrate a 'stigmatizing statement plus a deprivation of a tangible interest.'"  *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (quoting *Algarin v. Town of Wallkill*, 421 F.3d 137, 138 (2d Cir. 2005)); *see also Hefferan v. Corda*, 498 F. App'x 86, 89 (2d Cir. 2012) (summary order); *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004) ("For a government employee, a cause of action under § 1983 for deprivation of a liberty interest without due process of law may arise when an alleged

government defamation occurs in the course of dismissal from government employment."). Plaintiffs argue they were deprived of a liberty interest when Defendants restricted Plaintiffs' employment and then published stigmatizing information about them when Defendants "notified DOI of allegations that Plaintiffs were alleged to have committed HIPAA violations" and then "ensured that voluntary hospitals participating in the 911 system would be made aware that Plaintiffs were restricted from performing patient care."  Dkt. No. 57 at 20.  Defendants respond that Plaintiffs have not identified a stigmatizing statement made about them, that "[t]here is no evidence . . . that the reasons for plaintiffs' restriction were placed in their personnel file[s] much less any evidence demonstrating that future employers would gain access to their personnel files," Dkt. No. 74 at 18, and that the information communicated to employer-hospitals would have been neutral and incapable of being proven false since it conveyed only the name of an employee, the date of the restriction, and the type of restriction.  Defendants also argue that "plaintiffs cannot establish that they had been subject to a 'tangible state-imposed burden' . . . that courts in this Circuit have repeatedly held the employment actions falling short of termination do not satisfy the 'plus' portion of a stigma-plus claim."  *Id.* at 21 (quoting *Boss v. Kelly*, 306 F. App'x 649, 651 (2d Cir. 2009) (summary order)).

"To establish a 'stigma plus' claim, a plaintiff must show (1) 'the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,' and (2) 'a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.'"  *Vega*, 596 F.3d at 81 (quoting *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) (Sotomayor, J.)).  Stated differently, "to fulfill the requirements of a stigma-plus claim . . . , a plaintiff must . . . show" that (1) "the government made stigmatizing statements about him—statements that call into question plaintiff's 'good

name, reputation, honor or integrity,'" or "that 'denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession'"— and must "raise the falsity of these stigmatizing statements as an issue, not [necessarily] prove they are false"; (2) "these stigmatizing statements were made public"; and (3) "the stigmatizing statements were made concurrently in time to plaintiff's dismissal from government employment." *Patterson*, 370 F.3d at 330 (first quoting *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 446 (2d Cir. 1980), then quoting *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 630–31 (2d Cir. 1996)).  "To establish the second element, that the stigmatizing statements were made public, Plaintiff[s] must [show] 'that there had been any dissemination of [D]efendants' stigmatizing statements sufficient to affect [P]laintiffs' standing in the community or to foreclose future job opportunities.'" *Twardosz v. Yonkers Pub. Sch. Dist.*, 2020 WL 6135114, at *4 (S.D.N.Y. Oct. 16, 2020).

A plaintiff need not be terminated to bring a stigma-plus claim.  *See White Plains Towing Corp.*, 991 F.2d at 1063 ("The right not to be so defamed is not limited to situations involving termination of employment; it extends as well to defamation occurring in the course of termination of some other legal right or status." (internal quotation marks and citations omitted) (alteration adopted)). "Because 'a free-standing defamatory statement is not a constitutional deprivation, but is instead 'properly viewed as a state tort of defamation,' the 'plus' imposed by the defendant must be a specific and adverse action clearly restricting the plaintiff's liberty—for example, the loss of employment, or 'the 'termination or alteration of some other legal right or status.'" *Velez*, 401 F.3d at 87–88 (alterations adopted and citations omitted) (first quoting *Donato*, 96 F.3d at 631–32, then quoting *Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir. 1989));

*see also Waronker v. Hempstead Union Free Sch. Dist.*, 788 F. App'x 788, 794 (2d Cir. 2019) (summary order) ("Burdens that satisfy the 'plus' prong include 'the deprivation of a plaintiff's property and the termination of a plaintiff's government employment.'" (quoting *Sadallah*, 383 F.3d at 38)).  "[A] plaintiff's temporary suspension from work does not constitute an adequate 'plus' factor if the plaintiff suffers no financial loss."  *Waronker*, 788 F. App'x at 794.

"[I]n order to bring a successful stigma-plus claim, the plaintiff also must demonstrate that her liberty was deprived without due process of law.  Stated differently, the availability of adequate process defeats a stigma-plus claim."  *Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir. 2006).  Such "adequate process" for an adverse employment action for an at-will employee may be found where an "adequate, reasonably prompt, post-termination name-clearing hearing" is available.  *Id.* at 214; *see also Hefferan*, 498 F. App'x at 88 (explaining that "the failure . . . to make use of an adequate post-deprivation remedy such as a grievance hearing . . . will defeat a procedural due process claim on the merits, even if the post-deprivation remedy is no longer available at the time of suit").

Plaintiffs argue that Defendants published stigmatizing information about Plaintiffs in two respects: (1) they "notified DOI of allegations that Plaintiffs were alleged to have committed HIPAA violations, and (2) they ensured that voluntary hospitals participating in the 911 system would be made aware that Plaintiffs were restricted from performing patient care."  Dkt. No. 57 at 20.  They argue that "the communication that the individual has lost [the right to work on a voluntary hospital's ambulance in the 911 System] because she is restricted is a stigma that goes to her competence."  *Id.* at 20–21.  Plaintiffs' argument fails under both theories.

With respect to the first asserted publication of stigmatizing information—notifying DOI of allegations that Plaintiffs committed HIPAA violations—there is no dispute about the truth or

falsity of the fact that Plaintiffs were *alleged* to have engaged in HIPAA violations.  To the extent that Plaintiffs argue that the stigmatizing statement was the allegation that they committed HIPAA violations, such a charge may, in theory, constitute a stigmatizing statement that could give rise to a right to a name-clearing hearing if the statement was publicly disclosed in a way that would cause harm to Plaintiffs' job opportunities.  *See Brandt v. Bd. of Co-Op Educ. Servs.*, 820 F.2d 41, 44 (2d Cir. 1987) (explaining that employee's liberty interest was implicated where employee was discharged following charges of sexual misconduct).  But here, Plaintiffs have adduced no evidence that suggests that the information submitted to the DOI would be disclosed to a potential employer or would otherwise be "disseminated widely enough to damage the . . . employee's standing in the community or foreclose future job opportunities."  *White Plains Towing Corp.*, 991 F.2d at 1063 (quoting *Brandt*, 820 F.2d at 44); *cf. Brandt*, 820 F.2d at 45 ("If Brandt is able to show that prospective employers are likely to gain access to his personnel file and decide not to hire him, then the presence of the charges in his file has a damaging effect on his future job opportunities.").  That the statements were made to DOI—a New York City agency separate from the FDNY, Dkt. No. 72 ¶ 85—in the course of the investigation into the alleged HIPAA violations does not mean that they were sufficiently publicized "to warrant a ruling that the [Plaintiffs'] liberty interest has been impermissibly infringed."  *White Plains Towing Corp.*, 991 F.2d at 1063; *see also id.* (explaining that, where statements were made to other police officers, and "[g]iven that the primary function of a police force is law enforcement," the court "doubt[ed] that police officers' informing other police officers . . . that a given individual has been accused of being dishonest or is believed to have ties to organized crime can constitute a sufficient publication to warrant a ruling that the individual's liberty interest has been impermissibly infringed").  As Judge Nathan has recognized, while "[p]lacing

stigmatizing charges in a '*discharged* employee's personnel file' may qualify as public dissemination because those statements 'are likely to be disclosed to prospective employers,'" *Huda*, 2021 WL 1163975, at *4 (quoting *Donato*, 96 F.3d at 631), "an employee does not suffer a due process deprivation simply because accusations of misconduct 'h[ang] over his head during [disciplinary] proceedings,'" *id.* (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547 n.13 (1985)).

The second asserted publication—placing Plaintiffs on a restricted list and ensuring that voluntary hospitals participating in the 911 System would be made aware of Plaintiffs' restricted status—also cannot support a stigma-plus claim. Defendants argue that the statement that Plaintiffs were restricted is itself true and so Plaintiffs cannot raise the falsity of the statement as necessary to sustain its liberty-interest claim under a stigma-plus theory. A statement that an individual belongs to a classification can be stigmatizing, even if it is technically true that they have been classified as such, if the classification was improper given the underlying facts. *See, e.g.*, *Holley v. Cook*, 2020 WL 2494761, at *5 (D. Conn. 2020); *Parkman v. O'Connor*, 2019 WL 2015899 (D. Conn. 2019); *Vega*, 596 F.3d at 81–82 (stating that "it continues to be the case that wrongly classifying an inmate as a sex offender may have a stigmatizing effect which implicates a constitutional liberty interest"). In other words, it is not necessarily the falsity of the fact that Plaintiffs were on the restricted list that is relevant for the stigma-plus analysis, but what Plaintiffs being on the restricted list says about them that is relevant, and that is what Plaintiffs challenge as false.

"Not every derogatory statement made about an employee who loses his or her job imposes sufficient stigma to implicate the liberty interest and require a name-clearing hearing." *O'Neill v. City of Auburn*, 23 F.3d 685, 691 (2d Cir. 1994). Statements "will support a right to a

name-clearing hearing only when they denigrate the employee's competence as a professional

and impugn the employee's professional reputation in such a fashion as to effectively put a

significant roadblock in that employee's continued ability to practice his or her profession."

*Donato*, 96 F.3d at 631–32.  For example, statements that a public-school principal "'failed to

demonstrate that quality of leadership necessary to effectively deal with the educational

program'; that he was responsible for the rapid deterioration of the school; that he 'had not

provided for the basic safety of the children and staff'; and that his 'leadership' had 'created a

climate of confusion and discontent'" went "to the very heart of [his] professional competence"

and impaired his "chances of obtaining another supervisory position in the public school

system."  *Huntley v. Cmmty. Sch. Bd. of Brooklyn*, 543 F.2d 979, 985 (2d Cir. 1976), *cert.*

*denied*, 430 U.S. 929 (1977).  That is, "extensively detailed lists of [an individual's] supposed

professional failings" could implicate a liberty interest.  *Donato*, 96 F.3d at 631.  But "'vague

statements of unspecified "incompetence"'" would not harm an employee's professional

reputation so as to require a hearing."  *Id.* (quoting *O'Neill*, 23 F.3d at 693); *see also O'Neill*, 23

F.3d at 692–93 (concluding that statements that a public official—a City Engineer–

Superintendent of Public Works—was "fired for 'incompetence' and that he could 'no longer do

the job'" did not stigmatize the official in such a way that threatened to damage his professional

reputation and impede his ability to practice his profession, particularly where he was not called

"an incompetent engineer"); *Dingle v. City of New York*, 728 F. Supp. 2d 332, 346 (S.D.N.Y.

2010) ("A statement that an employee merely performed a job poorly or acted in an improper

manner is not sufficient.").

  In a similar vein, a statement that an employee exercised "poor judgment in a single

instance" and violated an employment policy or "failed to perform satisfactorily in a given

situation does not, by itself, raise the statements to the level of a constitutional violation."
*Piccoli v. Yonkers Bd. of Educ.*, 2009 WL 4794130, at *4 (S.D.N.Y. Dec. 11, 2009); *see also*
*TADCO Const. Corp. v. Dormitory Auth. of State of N.Y.*, 700 F. Supp. 2d 253 (E.D.N.Y. 2010)
(explaining that statements that the plaintiff "is in violation of its contractual obligation" and
"has failed to demonstrate the ability to complete the work" do not "go to the heart of [the
plaintiff's] professional competence" or are "insufficiently grave to create" the requisite stigma);
*Space Age Alarms, Inc. v. Bd. of Educ. of White Plains City Sch. Dist.*, 2009 WL 10740051, at
*5–6 (S.D.N.Y. Sept. 23, 2009) (holding that alleged statements that the plaintiff "failed to
perform satisfactorily" or meet requirements in a contract "fall far short of being sufficiently
stigmatizing so as to implicate [the] [p]laintiff's liberty interest").

The question is thus what would a notification made to hospitals in New York City's 911
System say about Plaintiffs?  As it turns out, not much.[10]  The notification that a hospital
participating in the 911 System gets when an EMT or paramedic employed by it has CAD VACS
that has been restricted contains only "the individual's first and last name, the individual's
unique four-digit identification, and whether the restriction was a medical, operational or driving
restriction."  Dkt. No. 71 ¶ 141.  Such a general statement that provides no detail about the

---

[10] To recap, hospitals in New York City deploy ambulances staffed with EMTs or paramedics to
respond to calls, including calls to the 911 System for emergency medical assistance.  Dkt. No.
72 ¶ 98.  Every EMT and paramedic who responds to calls for emergency services in hospital
ambulances responding to calls to the 911 System must have a CAD VACS identification
number.  *Id.* ¶ 99.  Some FDNY EMTs and paramedics are employed with voluntary hospitals
that deploy ambulances in the 911 System and work on those ambulances even while they are
employed with the FDNY, *id.* ¶ 102, but when an EMT's or paramedic's CAD VACS number is
suspended, he or she may not respond to calls for emergency medical assistance in the 911
System or log in to receive assignments in the 911 System, *id.* ¶¶ 102–103; *see also* Dkt. No. 71
¶¶ 133, 144.  When an EMT or paramedic is restricted by the FDNY from performing patient
care, her CAD VACS is also restricted, and the FDNY will send a notification to the ambulance
department of a hospital that participates in the 911 System and at which the EMT or paramedic
is employed.  Dkt. No. 72 ¶ 103.

reason for the restriction—including whether it was based on a one-off event or a deeper issue with the individual's ability to perform her job as a whole—could not reasonably be interpreted to so denigrate an individual's reputation that it would function to serve as a significant hinderance to practicing her profession.  Plaintiffs' stigma-plus claim fails because there is no evidence from which a reasonable jury could conclude that the statements that may have been made to hospitals as potential employers were sufficiently stigmatizing to implicate a liberty interest.

This case is thus fundamentally unlike *Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994), which Plaintiffs assert contains facts that "were nearly identical to those at issue here," Dkt. No. 75 at 5.  In that case, the plaintiff claimed that her protectible liberty interests were implicated by New York's maintenance of a "central register" that identifies individuals accused of child abuse or neglect—called the "New York State Central Register of Child Abuse and Maltreatment" (the "Central Register")—and the state's communication of those names to potential employers in the child-care field.  *Valmonte*, 18 F.3d at 994.  Under this system, individuals for whom there is "some credible evidence" to support a complaint of suspected child abuse (an "indicated" report) are listed on the Central Register, and the state will disclose that an individual is the subject of an indicated report on the Central Register—but not the nature of the indicated report—in response to an inquiry by a potential employer or licensing agency.  *Id.* at 995–96.  The Second Circuit agreed with the district court that the plaintiff sufficiently alleged the defamation prong of the "stigma plus" test because her inclusion on the list potentially damages her reputation and there is dissemination to potential employers.  *Id.* at 1000.  In *Valmonte*, unlike in this case, the plaintiff's inclusion on the list communicated something specific and damaging to those notified

of it—that there was credible evidence to support a finding that the plaintiff was a child abuser—and that specificity makes the cases anything but "nearly identical."

Insofar as Plaintiffs argue that, because they were unable to practice their profession (e.g., driving ambulances in the 911 System) as a result of the statement that their CAD VACS identifications were restricted, the statement that they were restricted was necessarily stigmatizing, that argument also fails. This is simply another way of arguing that the restriction *itself* implicated the liberty interest Plaintiffs have in their right to practice a profession—in this way, Plaintiffs' stigma-plus argument merges with their more general liberty interest argument.

Plaintiffs contend that, while they were restricted, they were deprived of a liberty interest in practicing their profession, which they define as "working as EMTs and Paramedics in New York City's 911 system—not just as employees of the FDNY, but as employees for any of the hospitals that supply ambulances in the system." Dkt. No. 57. "[L]iberty, as protected by the Fourteenth Amendment, include[s] a number of rights, including the right 'to engage in any of the common occupations of life.'" *Neu*, 869 F.2d at 666 (quoting *Roth*, 408 U.S. at 572); *see also Tsirelman v. Daines*, 794 F.3d 310, 315 (2d Cir. 2015) ("[P]hysicians have . . . a liberty interest in pursuing their chosen profession.").

However, "[t]his right is not [so] broad as to protect the right to a particular job." *Cityspec, Inc. v. Smith*, 617 F. Supp. 2d 161, 169 (E.D.N.Y. 2009) (citing *Roth*, 408 U.S. at 575); *see also Leon v. Rockland Psychiatric Ctr.*, 232 F. Supp. 3d 420, 435 (S.D.N.Y. 2017) (same); *Kosinski v. Conn. State Dep't of Educ.*, 2011 WL 1134236, at *5 (D. Conn. Mar. 24, 2011) ("The Due Process Clause of the Fourteenth Amendment does indeed protect an individual's liberty to engage in an occupation, but it does not grant a liberty interest in any particular employment position."). "[I]t is only when the challenged action effectively prohibits one from engaging in a

profession, or pursuing *any* job in a given field that there is a deprivation entitled to protection."
*Id.* (emphasis added). "[T]he Supreme Court, th[e] [Second] Circuit, and the other Circuits
addressing the issue have all indicated that the right of occupational choice is afforded Due
Process protection only when a plaintiff is 'complete[ly] prohibit[ed]' from engaging in his or
her chosen profession." *Hu v. City of New York*, 927 F.3d 81, 102 (2d Cir. 2019) (quoting *Conn
v. Gabbert*, 526 U.S. 286, 291–92 (1999)). In other words, "one must have no ability to practice
one's profession at all in order to state a claim for a deprivation of a liberty interest." *Colabella
v. Am. Inst. of Certified Pub. Accountants*, 2011 WL 4532132, *16 (E.D.N.Y. Sept. 28, 2011)
(quoting *Rodriguez v. Margotta*, 71 F. Supp. 2d 289, 296 (S.D.N.Y. 1999), *aff'd*, 225 F.3d 646
(2d Cir. 2000)); *see also Maniscalco v. N.Y.C. Dep't of Educ.*, 563 F. Supp. 3d 33, 38 (E.D.N.Y.
2021) ("Courts in this Circuit have held that unless the defendants denied plaintiff 'all
opportunities to practice' in a chosen profession, then there was no substantive due process
violation, even if the defendants' 'actions made it more difficult' to do so." (quoting *Marino v.
City Univ. of N.Y.*, 18 F. Supp. 3d 320, 340 (E.D.N.Y. 2014)); *cf. Tower Props. v. Vill.of
Highland Falls*, 2015 WL 4124499, *12–13 (S.D.N.Y. July 7, 2015) (citing *Rodriguez* and
holding that the plaintiff's claim based on a deprivation of its liberty interest fails because it "has
not alleged that it has been completely prevented from running its business" and instead has
alleged it "suffered financial damages and was forced to cancel only two events"); *Valmonte*, 18
F.3d at 1001 (holding that the plaintiff adequately alleged the "plus" part of a stigma-plus claim
when she alleged that, because of state law, "she will not be able to get a job in the child-care
field"). A liberty interest also will not be implicated when a person is "briefly interrupt[ed]"
from engaging in his or her profession. *See Hu*, 927 F.3d at 102 (quoting *Singleton v. Cecil*, 176
F.3d 419, 426 n.8 (8th Cir. 1999)).

In arguing that they were deprived of a liberty interest in pursuing their profession because they could not respond to calls in New York City's 911 System for the period of their restriction, Plaintiffs would define their profession too narrowly; such a definition could create a liberty interest whenever an individual is unable to practice one aspect of their profession. Courts have not embraced such an approach, instead finding that there is not a "complete prohibition" on occupational choice such that a liberty interest is implicated where the ability to operate a business is restricted or aspects of a profession are curbed.  For example, there is no liberty interest implicated when a restaurant is prohibited from offering indoor dining while permitting other services, *see, e.g.*, *Everest Foods Inc. v. Cuomo*, -- F. Supp. 3d --, 2022 WL 355553, at *9 (S.D.N.Y. Feb. 7, 2022); *Heidel v. Hochul*, 2021 WL 4942823, at *12 (S.D.N.Y. Oct. 21, 2021), or was restricted from operating at certain hours, *Columbus Ale House, Inc. v. Cuomo*, 495 F. Supp. 3d 88, 94 (E.D.N.Y. Oct. 16, 2020).  An individual's liberty interest in pursuing his profession will not be implicated where he is prohibited from working with a particular union or an entity affiliated with that union, because "he remains free . . . to pursue [other] employment opportunities in his profession."  *United States v. Hogan*, 2009 WL 3817006, at *13 (S.D.N.Y. Nov. 12, 2009).  Nor is there a "complete prohibition" where a lawyer is barred from conducting certain types of legal work, *Capogrosso v. Gelbstein*, 2019 WL 4686448, *12 (E.D.N.Y. Sept. 25, 2019), or where, more pertinently, a New York City public-school teacher is unable to teach in New York City's public schools, *Maniscalo*, 563 F. Supp. 3d at 39.  If the lawyer were able to create a liberty interest simply by defining her occupation as a "Traffic and Violations Bureau lawyer," or the schoolteacher by calling himself a "New York City public-school teacher," litigants would be able to circumvent the requirement that there be a

"complete prohibition" on participating in a profession by coming up with increasingly creative titles for their work.

It is undisputed that by restricting Plaintiffs' employment with the FDNY, Plaintiffs were unable to perform some of the activities for certain prospective employers that they would have otherwise been able to perform.  But it is also undisputed that they were still permitted to render medical care in emergency settings: the CAD VACS restriction does not prevent an ex-departmental employee—an EMT or paramedic who is employed by the FDNY and also holds employment for a hospital, Dkt. No. 71 ¶ 137—from responding to non-911 emergency calls or medical-related calls, operating non-CAD VACS ambulances, or performing other tasks that a participating employer-hospital would assign the employee, *id.* ¶ 145.  Nor, apparently, does it have any effect on employment with hospitals or organizations that provide ambulance services outside of the 911 System, even if those organizations do not receive 911 calls or are outside of New York City.

Even if the Court were to accept Plaintiffs' narrow definition of their profession as rendering emergency care by responding to ambulance calls, the restriction did not bar Plaintiffs from doing this job "either in New [York City] at some later point, or elsewhere in the state." *Crenshaw v. City of New Haven*, 2015 WL 5797018, *9 (D. Conn. Sept. 30, 2015) ("Plaintiff's claim of a liberty interest in his employment as a New Haven firefighter necessarily fails because he does not (nor could he) allege that his removal from a single eligible list effectively bars him from being a firefighter, either in New Haven at some later point, or elsewhere in the state."). The restriction complained of relates only to hospitals that are part of the 911 System in New York City and assignments for which an unrestricted CAD VACS identification is required— there is no evidence that it extends to hospitals or ambulatory providers outside of that system

(i.e., not responding to 911 calls), non-CAD VACS ambulances, or hospitals or ambulatory providers outside of New York City. *Cf.* Dkt. No. 71 ¶ 144 ("The restriction or suspension of the CAD/VACS number prevents an EMT or Paramedic from receiving 911 assignments or operating a CAD/VACS ambulance."). As Judge Cogan of the Eastern District of New York recently observed in considering whether state action that "may ultimately disqualify plaintiffs from employment in their positions at public schools in New York City" implicated a liberty interest:

> [A]lthough defendants may render it more difficult for them to pursue their calling, plaintiffs are not absolutely barred from doing so. For example, plaintiffs [who are teachers or educational paraprofessionals] may pursue teaching or paraprofessional jobs at . . . public and private schools *outside of New York City*, daycares or early childhood education centers, tutoring centers, adult or continuing education centers, virtual institutions, or within home settings. Therefore, plaintiffs are not being denied their fundamental right to pursue their profession.

*Maniscalco*, 563 F. Supp. 3d at 38–39 (emphasis added). Here, too, although it was perhaps "more difficult" for Plaintiffs to do the jobs they would have liked during their period of restriction, the effect of the suspended CAD VACS number was not so drastic as to "absolutely bar[]" Plaintiffs from serving as EMTs or paramedics in ambulatory settings.

Because there is no evidence from which Plaintiffs could show that the disclosure of a stigmatizing statement sufficient to implicate a liberty interest or that they were otherwise completely prohibited from practicing their profession as a result of the FDNY's actions, they cannot prevail on their claim that they were deprived of a liberty interest without due process. Defendants are entitled to summary judgment on Plaintiffs' due process claims.

In a footnote in their moving papers, Plaintiffs state that:

> N.Y. Const. Article I, § 6, also bars the deprivation of "life, liberty or property without due process," but omits the reference to the "state." For this reason, among others, the N.Y. Const. provides greater protection under its Due Process Clause than is provided by the Fourteenth Amendment. *Sharrock v. Dell Buick-Cadillac, Inc.*, 45 N.Y.2d 152 (1978).

Dkt. No. 57 at 18 n.5.  Plaintiffs provide no argument for why the Court's decision with respect to Plaintiffs' due process claim should be different under state law, and the specific difference pointed out by Plaintiffs appears to be immaterial where, as here, the action complained of is by a public agency.  The Court's conclusions with respect to Plaintiffs' due process claims thus apply regardless whether the claim is brought under the state or federal constitution.

## III.    Whether the City of New York May be Liable Under the *Monell* Doctrine

Defendants argue that they are entitled to summary judgment on Plaintiffs' *Monell* claim against the City.  The argument is limited to not more than a single sentence not supported by citation to the record evidence.  They argue that "the record is devoid of any evidence[] that the City has a policy, practice, or custom that caused the alleged violations of [P]laintiffs' First Amendment rights or due process rights."  Dkt. No. 63 at 37.  They also reiterate the arguments that "Plaintiffs have not demonstrated either that they engaged in speech protected by the First Amendment or that any of the actions about which they complain[] in this lawsuit were taken in retaliation for his complaints [sic]."  *Id.*

Pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny, "a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality."  *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012).  "Thus, to hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Batista v. Ridriguez*, 702 F.2d 393, 397 (2d Cir. 1983); *see also Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007).  Liability will attach if the violation resulted from a "government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."

*Monell*, 436 U.S. at 694.  The rule captures the notion that even where a high-level official's exercise of governmental power does not violate clearly established law, and he cannot be held personally liable for a constitutional violation, the decisions he makes may constitute government policy sufficient to hold the government liable.  "When 'an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy.'"  *Nagle*, 663 F.3d at 116 (quoting *Clue*, 179 F.3d at 62).  "[W]hether an official had final policymaking authority is a question of state law."  *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).  "Because of this, 'municipal liability may be imposed for a single decision by municipal policymakers.'"  *Id.* (quoting *Pembaur*, 475 U.S. at 483).

With respect to their due process claims, Plaintiffs assert that the City is liable under *Monell* because "the actions taken by Defendants that give rise to Plaintiffs' Due Process Claims . . . were taken in accordance with the regular practices and custom of the City."  Dkt. No. 64 at 41.  Plaintiffs also argue that, if *Monell* does bar a claim against the City under § 1983, they are entitled to pursue their free speech and due process claims against the City under the New York Constitution because there would be no alternative remedy to vindicate the rights that the New York Constitution guarantees.  *Id.* at 41–46.  For the reasons explained above, the Court concludes that Defendants are entitled to summary judgment on Plaintiffs' due process claims, whether brought under the federal or state constitution.  "Because [Plaintiffs] [were] unable to establish an underlying violation of [their] constitutional rights [to due process], . . . [their] *Monell* claim necessarily fail[s] as well."  *Schultz v. Inc. Vill. of Bellport*, 479 F. App'x 358, 360 (2d Cir. 2012) (summary order) (citing *Segal*, 459 F.3d at 219, for the proposition that "[b]ecause the district court properly found no underlying constitutional violation, its decision

not to address the municipal defendants' liability under *Monell* was entirely correct").  Because there were no liberty or property rights that could have been violated, Plaintiffs' due process claims against the City fail.

With respect to their First Amendment claims, Plaintiffs argue that because Velez made the decision to restrict their employment, the choices he made represent government policy under the theory that adverse action, "if ordered by a person 'whose edicts or acts may fairly be said to represent official policy,' may support an action against the municipal corporation.'"  *Rookard v. Health and Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983) (quoting *Monell*, 436 U.S. at 694)).  That is, "municipal liability may be predicated upon the constitutional acts of a subordinate official who has been delegated final authority in limited areas."  *Id.* at 45 n.3.  "[T]he critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker *with respect to the particular conduct challenged in the lawsuit*."  *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008).  Because "[a]n official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions," to determine whether someone has the requisite policy-making authority, a court must consider "proof of the official's scope of employment and his role within the municipal or corporate organization."  *Rookard*, 710 F.2d at 45.  Thus, evidence that an individual "held a top level position with [an organization] and had authority to order" personnel decisions, along with evidence that the individual's "authority over personnel decisions was final"—including that the organization's president and general counsel refused to intervene in the personnel decision—is sufficient to show a municipal policy.  *Id.* at 45–46.  Similarly, where, under a regulation, "the power to suspend [a] [p]laintiff pending a determination of the charges brought against him rested solely

101

with" a person, that person's decision constitutes "an act of a final policymaker sufficient to create potential liability for the [municipal agency] for the alleged retaliation." *Portelos v. City of New York*, 2016 WL 11469183, at *7 (E.D.N.Y. Aug. 13, 2016).

Defendants confine their response to Plaintiffs' argument to the conclusory statement that "the record is devoid of any evidence demonstrating that defendant Velez has any final policymaking authority within the FDNY and as such his actions cannot constitute official government policy." Dkt. No. 76 at 25.  Defendants do not discuss any of the evidence. Plaintiffs, however, point to evidence that Velez had final authority to make decisions on restrictions and suspensions of members of the FDNY.  Dkt. No. 64 at 52 (citing Dkt. No. 59-6 at 8, 11–17).  Indeed, Velez testified that he has the responsibility to manage BITs, that the decision to restrict or suspend EMTs or paramedics is made by that Bureau, and that Velez himself has "the authority to make a decision on a disciplinary action short of termination." Dkt. No. 59-6 at 13; *see also id.* at 8, 12–15; *cf. id.* at 13 (Velez testifying that he "can only recommend termination" and someone else makes a "final decision on termination").  He testified that a suspension of an EMT or paramedic requires his approval or the approval of his deputy in his absence.  *Id.* at 14.  He also testified that he made the decision to restrict the employment of Pfeiffer, Nunez, and Bonilla and to suspend and restrict the employment of Rugen.  *Id.* at 16–17.  This evidence suggests that the FDNY "had officially vested [Velez] with the authority to carry out the actions [allegedly] causing the civil rights violations." *Roe*, 542 F.3d at 40.  In those circumstances, and assuming the jury finds a constitutional violation, it would not be inappropriate to hold the city liable for that violation.  In light of the evidence that Velez has final authority with respect to restricting or suspending employment—in contrast to a termination, where he can only make a recommendation—Defendants have not shown that they

are entitled to summary judgment on Plaintiffs' *Monell* claims with respect to the asserted violation of their First Amendment rights.

## IV.    Whether Plaintiffs' State Law Claims Survive

Plaintiffs bring their claims under both the state and federal constitutions.  Defendants argue that, because there is an "'alternative remedy under § 1983 for violations of parallel provisions of the U.S. Constitution,'" "no implied right of action exists 'for violations of the New York State Constitution.'"  *Radice v. Eastport South Manor Cent. Sch. Dist.*, 437 F. Supp. 3d 198, 209 (E.D.N.Y. 2020) (quoting *Sutter v. Dibello*, 2019 WL 4195303, at *9–10 (E.D.N.Y. Aug. 12, 2019)); Dkt. No. 63 at 36 (citing *Radice*); *Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016) (summary order) ("The New York State Constitution provides a right of action where remedies are otherwise unavailable at common law or under § 1983.").  Indeed, where a § 1983 claim is brought for a parallel constitutional right, a court will properly dismiss state constitutional claims.  *See, e.g.*, *Allen*, 665 F. App'x at 13 (affirming dismissal of § 1983 claims as well as state constitutional claims); *see also Talarico v. Port Auth. N.Y. & N.J.*, 367 F. Supp. 3d 161, 171 ("[W]here a complaint alleges no theories of liability that are cognizable exclusively under the New York State Constitution, any claims brought under the state constitution are ordinarily dismissed.").  The Court will therefore dismiss Plaintiffs' state constitutional claims against the individual Defendants, as the theory of liability brought for those claims is duplicative of the theory of liability under the federal constitution.[11]

---

[11] Plaintiffs do not meaningfully dispute the principles underlying this conclusion, instead focusing their argument on whether their claims against the City should be barred because of the availability of a § 1983 claim.  To the extent that Plaintiffs argue that the New York Constitution offers broader protection than the federal constitution with respect to their due process claims, as explained above, they "offer[] no case law or other authority suggesting that the specific conduct alleged here falls within any of th[e] areas" for which there is broader protection.  *Talarico*, 367 F. Supp. 3d at 172.  "Absent any such indication, . . . [Plaintiffs'] state-law claims rise or fall with [their] Section 1983 claims," and "[b]ecause Section 1983 offers an adequate remedy to

However, as courts in this Circuit have recognized, "§ 1983 does not provide an adequate alternative remedy for [a] [p]laintiff's state-constitutional claims, to the extent they are asserted against the City under a theory of respondeat superior.  Because § 1983 does not authorize respondeat-superior liability, . . . it cannot provide an adequate alternative remedy for Plaintiff's New York State constitutional claims, to the extent they are asserted against the City."  *Alwan v. City of New York*, 311 F. Supp. 3d 570, 587 (E.D.N.Y. May 2, 2018); *see also Hawthorne by Hawthorne v. Cnty. of Putnam*, 492 F. Supp. 3d 281, 305 (S.D.N.Y. 2020) ("[A]s the Court has discussed, § 1983 does not permit Plaintiff to assert his claims against Putnam County under a theory of *respondeat superior*, which Plaintiff invokes in his Complaint.  Thus, it cannot provide an adequate alternative remedy for Plaintiff's New York State constitutional claims to the extent they are asserted against Putnam County.").

A plaintiff may still be foreclosed from pursuing a claim under the New York Constitution "if an alternative remedy is available . . . under state tort law or through a New York Civil Practice Law and Rules Article 78 action."  *Alwan*, 311 F. Supp. 3d at 586.  The parties dispute whether there is an adequate remedy available outside of § 1983, including under New York Civil Service Law § 75 and the grievance or arbitration procedure set forth in the CBA.  *See* Dkt. No. 63 at 37 (Defendants arguing that "given plaintiffs' ability to address their claims pursuant to § 1983, NY CSL § 75 and the grievance and arbitration procedures set forth in their collective bargaining agreement, the claims brought pursuant to the New York State Constitution, Article I, §§ 6 and 8 must be dismissed"); Dkt. No. 64 at 46 (Plaintiffs responding that they "do not have a 'whistleblower' claim under Civil Service Law § 75-B, because their

---

redress any injury inflicted by the specific conduct alleged here, then, the New York State Constitution does not itself provide a cause of action."  *Id.*

communications did not deal with the limited subject matters protected by that statute," "the CBA procedure gives Plaintiffs no adequate remedy, and an Article 78 proceeding is not a vehicle through which they can pursue compensation for their injuries or timely relief from the restrictions themselves").  However, Defendants in their reply brief "do not dispute the assertion" that "because *Monell* does not allow for a municipality to be liable under § 1983 solely on a theory of *respondeat superior* that they can thereby pursue their claims against the City, on a theory of *respondeat superior*, pursuant to Article I, §§ 6, 8 of the New State [sic] Constitution," but "note that plaintiffs' claims nonetheless fail because they have no viable underlying claims of constitutional violations by which vicarious liability can attach."  Dkt. No. 76 at 25.

Accepting Defendants' concession that Plaintiffs could pursue their claims against the city on a theory of respondeat superior so long as there is a viable claim of a constitutional violation by which vicarious liability can attach, *see id*., and recognizing that a jury may not return a verdict in favor of Plaintiffs on their surviving *Monell* claim, the Court concludes that Plaintiffs may pursue their state constitutional claim for violation of their free-speech rights against the City.[12]  Defendants' request for summary judgment is denied as to this claim.

---

[12] The conclusion would be the same absent such a concession, as the parties dispute whether there was an adequate post-deprivation remedy for restricted employment, which both parties agree "is not discipline." Dkt. No. 72 ¶ 61.  For example, Defendants point to evidence that suggests that restrictions of duty were subject to the grievance procedure in the CBA, Dkt. No. 71 ¶ 93 (citing relevant CBA provisions), while Plaintiffs point to evidence that suggests that such restrictions could only be successfully grieved if they were disciplinary in nature, Dkt. No. 72 ¶ 142 (citing arbitration decision considering grievances for restrictions).  And the provision of the New York Civil Service Law cited by Defendants, § 75, appears on its face to apply only to "removal and other disciplinary action," neither of which occurred here.  N.Y. Civ. Serv. L. § 75.

## CONCLUSION

Plaintiffs' motion for summary judgment is DENIED.  Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Plaintiffs are entitled to a jury trial on their § 1983 claims for First Amendment retaliation against all Defendants and on their related free-speech claim under the New York State Constitution against the City on a theory of respondeat superior.

The Clerk of Court is respectfully directed to close Dkt. Nos. 45 and 58.


SO ORDERED.


Dated: July 8, 2022
      New York, New York

_____
LEWIS J. LIMAN
United States District Judge